DONALD G. TEELING, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3426–62. Filed June 30, 1964.

---

[4] N.Y. Debt. & Cred. Law. sec. 273; *Feist* v. *Druckerman*, 70 F. 2d 333 (C.A. 2, 1934); *Capizzi* v. *Khoury*, 168 Misc. 490, 5 N.Y.S. 2d 201 (1938).

*Robert E. Johnson*, for the petitioner.

*Thomas J. Young*, for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency in petitioner's income tax for the calendar year 1960 in the amount of $2,583.05.

The issues for decision are:

(1) Whether the rates of tax applicable to an individual who is head of a household are proper for petitioner to use for the calendar year 1960, either because his daughter Donna had her principal place of abode in his home for that entire year or because he maintained a household which constituted the principal place of abode of his father or mother for that taxable year.

(2) Whether an amount of $1,716.98 of a total deduction for travel, sales promotion, and entertainment expense of $16,444.35 claimed by petitioner as deductible on his income tax return for the year 1960, or any portion of the $1,716.98, was properly deductible as an ordinary and necessary business expense.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner, an individual residing in Indianapolis, Ind., filed his individual income tax return for the calendar year 1960, with the dis· trict director of internal revenue at Indianapolis, Ind.

Petitioner is and was during the taxable year 1960 a citizen of the United States, and at the close of that taxable year was not married and was not a surviving spouse as defined in the Internal Revenue Code of 1954.

During the entire taxable year 1960 petitioner maintained a home in Indianapolis, Ind., which constituted his principal place of abode throughout that entire taxable year. Petitioner furnished over one-

half of the cost of maintaining the house which constituted his home in Indianapolis, Ind., during the calendar year 1960.

Petitioner has two daughters, Donna and Patricia. Donna was born on October 1, 1942, and Patricia on September 10, 1947. Petitioner and his former wife, Frances C. Teeling, the mother of Donna and Patricia, were divorced in 1956. Prior to the divorce in 1956, Donna and Patricia continuously lived in petitioner's home in Indianapolis, Ind. After the divorce in 1956 and until the early part of 1959, petitioner continued to maintain the home in which he and his wife and two daughters had lived prior to the divorce.

In the spring of 1959, petitioner purchased a different house in Indianapolis which consisted primarily of two bedrooms, two baths, a living room, dining room, and kitchen. This house was 10 years old when petitioner purchased it. With the assistance of a professional interior decorator, petitioner redecorated and refurnished the house. Petitioner redecorated the rear bedroom and bath for himself. The front bedroom was decorated in a feminine manner with a white rug on the floor.

The divorce decree granted custody of Donna and Patricia to their mother, Frances C. Teeling, subject to the right of petitioner to visit the two children and to have a reasonable opportunity to have them with him on weekends and holidays and for a part of the school vacation period in the summertime.

During the years 1956 to 1959, Donna resided with her mother in West Lafayette, Ind., but she did stay at petitioner's home in Indianapolis at various times during part of the summers and during other high school vacations including the Christmas vacation of 1959.

In the fall of 1959 Donna entered into her senior year in high school. Petitioner's home in Indianapolis in 1960 was located about 2 or 3 miles from Butler University. Petitioner anticipated that upon completion of high school in May of 1960, Donna would come to his home in Indianapolis and that in the fall she would enroll in Butler University. After graduating from high school the last week of May 1960, Donna did go to petitioner's home and spent some time there during the summer. However, for several weeks during the summer Donna returned to West Lafayette and worked as a counter girl at Purdue University.

It was not feasible for petitioner to have either Donna or Patricia stay with him full time because it was necessary for him to spend many nights away from home and he was unwilling to have his daughters stay at his house alone when he was away. At Christmastime in 1959, Donna left some of her personal belongings including clothing, golf clubs, a tennis racquet, and a small phonograph in the femininely decorated room in petitioner's home.

In the fall of 1960 Donna enrolled at Butler University and took a room at one of the university dormitories. Petitioner paid Donna's tuition and related expenses at Butler University. Donna continued to keep some of her personal belongings at petitioner's home and when petitioner was in town she would frequently come over at night and cook dinner for petitioner, and often petitioner would call the dormitory and get permission for her to stay at his home overnight. Donna spent many weekends at petitioner's home and also spent weekends away from the university with friends of hers in Indianapolis. She also visited her mother and sister in West Lafayette, Ind., while she was enrolled in Butler University during the calendar year 1960.

During the calendar year 1960 petitioner furnished the support for Donna and she qualified as a dependent of petitioner in the taxable year ended December 31, 1960.

In 1960 petitioner's mother, Eleanor M. Teeling, was 75 years old, and his father, Matthew A. Teeling, was 79 years old. Petitioner's father and mother during the year 1960 lived in a 5-room bungalow at Crystal Lake, Ill., a town with a population of about 8,000 persons 50 miles northwest of Chicago, Ill. Petitioner's father and mother owned the bungalow in which they lived and there was no mortgage on it.

In the fall of 1959 petitioner's father became ill. In early January 1960, he entered Passavant Hospital and was diagnosed as having cancer. He was in Passavant Hospital for approximately 3 weeks and then was moved to Northwest Hospital in Chicago, Ill., receiving treatment for cancer. Around the first of March he returned home from Northwest Hospital and remained at home until his death on June 1, 1960. When petitioner's father was in Northwest Hospital in Chicago, petitioner's mother visited him about twice a week until she fell on the ice outside the hospital and was placed in a room in Northwest Hospital across from her husband.

When petitioner's mother went to Chicago to visit his father in the hospital, she took a train from Crystal Lake to Chicago. Petitioner's father and mother did not own an automobile in 1960 and used taxis for local transportation to places which were too great a distance for them to walk.

When petitioner's father returned from Northwest Hospital, it was necessary for petitioner's mother to have a nurse for a few hours a day to assist with bathing him and caring for him. Petitioner's mother paid the nurse at the rate of $5 per day.

Petitioner's father was a dentist and had maintained some practice until the fall of 1959, although he had had very little work and income for 5 years preceding his death. He had dropped all except $2,000 of his insurance.

Petitioner's father and mother had only a few hundred dollars of savings at the beginning of 1960 and petitioner's mother gave this amount to a daughter who had a nervous breakdown during the year and needed the amount in order to be able to pay hospital bills. The $2,000 of insurance which was collected after petitioner's father's death on June 1, 1960, went in part payment of funeral expenses, the total cost of which was in excess of $2,600.

After her husband's death in 1960, petitioner's mother continued to live in the bungalow at Crystal Lake, Ill., and did her own marketing and cooking. She did visit a daughter in California for a period of about 1 month and while she was there she paid room and board because her daughter's family was in a very low income bracket.

During the first 5 months of 1960, petitioner's mother and father received social security benefits of $151.15 a month, of which $101.15 was for petitioner's father and $50 for his mother. After the death of petitioner's father, petitioner's mother, for the last 7 months of 1960, received $75 a month in social security benefit payments. Other than the social security payments and the $2,000 of insurance which petitioner's mother received upon the death of his father, neither petitioner's mother nor father had any sources of income or receipts of money, except for the amounts which they received from petitioner or amounts which petitioner paid for their expenses. Petitioner paid $3,482.21 in doctor and hospital bills for his father and mother during the year 1960 and deducted these amounts on his return as medical expenses, which deduction was allowed by respondent. In addition, petitioner paid on February 26, 1960, nursing expenses of $30 which were not deducted on his income tax return and paid certain drug expenses for his mother and father which were not deducted because of not being in excess of 1 percent of petitioner's adjusted gross income.

In addition to paying the hospital, doctor, and drug bills for his mother and father, petitioner gave to his mother 10 checks in the amount of $100 each, dated February 18, March 3, March 29, April 15, April 30, July 20, September 27, October 28, November 30, and December 23, 1960.

During the year 1960 petitioner visited his mother and father, or his mother after his father's death, at Crystal Lake on at least 22 occasions and on each of these visits gave his mother cash ranging from $20 to $50 depending on her needs at the particular time. Petitioner in addition to the $1,000 given to his mother by checks gave his mother at least $600 in cash in the calendar year 1960.

Petitioner's mother intermingled the funds given to her by petitioner with the money she and her husband received from social security and paid all the household expenses and personal expenses

for herself and her husband, while he was living, from these funds, except for doctor, hospital, and certain drug and nursing bills that were sent directly to petitioner and paid by him to the person rendering the bill and some small amounts for groceries which petitioner paid directly when visiting his mother. The expenses paid by petitioner's mother out of the intermingled funds from social security and receipts from petitioner included property taxes, utilities, general upkeep on the Crystal Lake house, property insurance, and groceries as well as small contributions to church and charities, some clothing, an occasional present, railroad fare, taxi fares when necessary, nurses services for petitioner's father after March 1960, and a few doctor bills for petitioner's mother.

On his tax return petitioner took a dependency exemption for his mother and a dependency exemption for his father, and these claimed dependency exemptions have not been disallowed by respondent.

During the year 1960 and for a number of years prior thereto, petitioner was a manufacturers' representative operating a manufacturers' agency or sales outlet for six out-of-State manufacturers or their subsidiaries. These manufacturers made, among other things, small parts for industry such as fasteners, springs, powdered metal parts, and stampings. The manufacturing companies which petitioner represented during the year 1960 were Accurate Spring Co. and Accurate Wire Forming Co., its subsidiary; Micromaster Co. and Republic Fastener Corp., Swiss Master, and Pentagon Inc., its subsidiaries; Thompson Bremer Co. (division of American Machine & Foundry) ; Prentiss Products; and International Powder Metallurgy.

Petitioner came to Indianapolis, Ind., in 1946 as a salaried salesman for Accurate Spring Co. At the end of 1 year, he stopped receiving a salary and started his own business of manufacturers' sales representative, receiving a commission, and continued in this business throughout the year 1960. When petitioner first started in business for himself, he was determined to give the impression of a successful man. He bought a luxury car and hired a publicity agent in order to obtain good publicity from the local press. Thereafter, he joined the Press Club with a view to becoming acquainted with newspapermen and thereby obtaining favorable publicity.

In line with his view of giving an impression of being successful, petitioner took his customers to dinner and lunch only at places which he considered first class.

Petitioner also considered it important to maintain cordial relationships with the representatives of the principals whose products he sold. During the year 1960, the employees of Accurate Spring Co., with whom petitioner dealt were A. A. Bonde, Jim Bonde, Al Bonde, Robert Madden, and Ed Hamilton. The employees of Micromaster

Co. with whom petitioner dealt were Don Anderson, Carl Morris, and a man named Erickson. The representatives of Thompson Bremer Co. with whom petitioner dealt were Gail Rutledge, Bill Evans, and Bill Bedford. The representatives of General Industries with whom petitioner dealt were Jim Callahan and Russ Smith; and the representatives with whom petitioner dealt from International Powder Metallurgy were William Hall, Earl Hawber, and M. T. Victor.

Some of the products which petitioner sold were similar to or identical with products manufactured by approximately 80 companies in the Chicago area. Some of the products that petitioner sold were highly engineered precision parts. Some of petitioner's sales were made on a competitive-bid basis. At times petitioner would be able to effect a sale if he could guarantee delivery the next day on the item and at other times when dealing with precision parts petitioner would be able to make a sale if he could assure his customer that an engineer from the manufacturing company (petitioner's principal) would come and work with the purchaser to demonstrate the best manner of using the product.

During the year 1960 petitioner kept a daily record of his expenditures. He kept a small booklet which he generally carried with him and noted down expenses when he was traveling or when he took representatives of his principals or his customers out to meals, whether in Indianapolis or other places. In this booklet he noted expenditures under various headings such as breakfast, lunch, dinner, entertainment, hotels, gasoline, parking, and the like. He would usually give a brief explanation of the expenditure such as the name of the person entertained. For large expenditures petitioner would often, in addition to noting the expenditure, write an explanatory sheet for his file with respect to why the expenditure was made. At times petitioner charged items at restaurants and would receive the bill later and pay the bill by check.

Petitioner employed Taylor Bookkeeping Service to write up his books of account monthly and at the end of the year to make yearend adjustments and prepare a yearly profit-and-loss statement of his business operations. The entries made by the accountant assigned to keep petitioner's books by Taylor Bookkeeping Service were primarily on the basis of information furnished by petitioner with the accountant advising in certain instances as to the proper category in which to enter the item. The profit-and-loss statement prepared for petitioner by Taylor Bookkeeping Service for the year 1960 was incorporated in petitioner's 1960 income tax return. This profit-and-loss schedule showed a net profit from petitioner's business as manufacturers' agent of $47,179.98, which net profit petitioner reported on his 1960 income tax return as his only source of income for the year 1960. The net

profit of $47,179.98 was derived from gross receipts of $87,116.57 less expenses of $39,936.59. Included in the total expenses of $39,936.59 were the following items:

| | |
|---|---|
| Travel | $11, 617. 21 |
| Sales promotion | 1, 956. 61 |
| Entertainment | 2, 870. 51 |
| Total | 16, 444. 33 |

Traveling expenses of $11,617.21 were listed in detail on a separate schedule on petitioner's return and were shown to include $5,145.91 of entertainment expenses which was in addition to the $2,870.51 listed as entertainment on the profit-and-loss statement.

Respondent in his notice of deficiency disallowed $1,716.98 of the travel and entertainment expenses claimed by petitioner with the explanation that—

" It is determined that of the travel and entertainment expenses deducted on the return an amount of $1,716.98 was expended for personal travel and entertainment expenses as defined in section 262 of the Internal Revenue Code of 1954 and are not deductible under the provisions of section 162 of the Internal Revenue Code of 1954.

Of the amount of $1,716.98 disallowed by respondent, $999.83 consists of expenses of weekend trips taken by petitioner to Chicago and costs of entertaining representatives of his principals. Included in the $999.83 is $188.30 for oil and gas, car repairs, hotel bills, tips, telephone calls, and tolls for trips made by petitioner to Chicago over weekends on the following dates in 1960:

| | | |
|---|---|---|
| Friday, Feb. 5 | Monday, Mar. 28 | Friday, May 6 |
| Sunday, Feb. 7 | Saturday, Apr. 9 | Saturday, May 7 |
| Sunday, Mar. 13 | Sunday, Apr. 10 | Saturday, Sept. 17 |
| Monday, Mar. 14 | Saturday, Apr. 23 | Monday, Sept. 19 |
| Sunday, Mar. 27 | Monday, Apr. 25 | Sunday, Sept. 25 |

Also included in the amount of $999.83 is an amount of $811.53 consisting of meals of petitioner on the eight trips to Chicago for which other expenses were disallowed, one item of $2.50 for a meal of an employee, and entertainment expenses for meals at which petitioner entertained representatives of his principals and their wives, some such entertainment expenses being on the same weekends for which travel expenses were disallowed to petitioner and other such entertainment expenses being at other times. Petitioner made other weekend trips to Chicago, the expenses of which respondent did not disallow. Petitioner also made a trip to Chicago around June 1, at which time he attended his father's funeral. Petitioner charged the cost of this trip to his business account, and respondent did not disallow the transportation costs nor all of the expenses of this trip deducted by petitioner. On each of the weekends with respect to

which respondent disallowed the deduction of oil and gas and related expenses, petitioner stopped by Crystal Lake to see his parents or his mother. In addition, petitioner stopped by or went to Crystal Lake to see his parents at other times on weekend trips to Chicago.

Occasionally on weekend trips to Chicago, petitioner stayed overnight at his parents' home in Crystal Lake or at the home of Don Anderson in Chicago. On such occasions petitioner deducted no amount for a hotel bill.

Of the total amount of $1,716.98 of travel and entertainment expenses disallowed by respondent, $511.37 represented amounts expended by petitioner in restaurants in Indianapolis, Ind. The aggregate amount was composed of numerous individual items ranging from a low of $1.70 to a maximum of $33.24. In each instance the amount disallowed represented 25 percent of the amount petitioner had included in his deduction for entertainment expenses. The total amounts of which the disallowed portions were 25 percent were expenditures for dinners and drinks for petitioner, representatives of petitioner's customers and their wives, and members of petitioner's family, and a personal friend of petitioner. Most of the expenditures of which respondent disallowed 25 percent were made on Friday evenings, Saturdays, or Sundays. Although the wives of petitioner's customers were not always included in the dinner party to which the expenditures which were partly disallowed by respondent related and a personal friend of petitioner or member of his family was only occasionally included, in each such instance the entire cost of the dinner or drinks, including the portion consumed by petitioner, the customers' wives, and by petitioner's personal friend or family member, was charged by petitioner as business deduction for entertainment expenses.

The remaining $205.94 [1] of the $1,716.98 disallowed by respondent consisted of four bills paid by petitioner in 1960. Two of these bills, one in the amount of $27 and the other in the amount of $80, were for steaks which petitioner had delivered to representatives of his customers whom he had invited to dinner on two occasions when they had been unable to come. Petitioner had the steaks delivered to the various customers with a card attached saying, "In lieu of eating with Teeling." The $80 item represented steaks sent to a number of different customers. The remaining portion of the $205.94 consisted of two bills, one of $55.94 and the other of $43, for Polaroid film. The $55.94 bill was for Polaroid film which petitioner sent in April 1960 to two representatives of Western Electric Co., which was one of petitioner's cus-

---

[1] It will be noted that the total of the amounts of $999.83, $511.37, and $205.94 is $1,717.14. The 16 cents difference in this figure and the $1,716.98 disallowed by respondent is not explained in the record

tomers, and the $43 bill for Polaroid film was for film sent as a Christmas present to the same two representatives.

Petitioner on his tax return computed his tax on the basis of the rates provided for head of a household. Respondent in his notice of deficiency, in addition to disallowing $1,716.98 of the total deduction claimed by petitioner for travel and entertainment expenses as heretofore set forth, and making certain other minor adjustments not here in issue, recomputed petitioner's income on the basis of the rates applicable to a single individual not the head of a household with the following explanation:

In making this determination of your income tax liability it is determined that the household you maintained was not the principal residence of your unmarried daughter for the entire taxable year ended December 31, 1960, therefore you do not qualify as head of a household in accordance with the provisions of section 1(b) of the Internal Revenue Code of 1954 and the deficiency in income is determined under the provisions of section 1(a) of the Internal Revenue Code of 1954.

### ULTIMATE FACTS

1. Petitioner's home did not constitute the principal place of abode of his daughter Donna Teeling for the taxable year 1960.

2. During the taxable year 1960 petitioner paid more than one-half of the cost of maintaining a household for his dependent father and mother.

3. Petitioner has failed to establish that the amount of $188.30 of transportation costs and related expenses of trips he made to and from Chicago over weekends during the taxable year 1960 were ordinary and necessary business expenses.

4. Petitioner has failed to establish that costs of meals in Chicago and entertainment expenses for representatives of his principals and their wives were ordinary and necessary business expenses in 1960 except to the extent of an amount not in excess of $214.

5. Petitioner has failed to establish that any portion of the $511.37 disallowed by respondent representing one-fourth of certain expenditures made in Indianapolis, Ind., constituted ordinary and necessary business expenses.

6. The amount of $205.94 expended by petitioner during the year 1960 to have steaks and Polaroid film delivered to representatives of various customers constituted ordinary and necessary business expenses except to the extent of $55.94.

### OPINION

In order for petitioner to be entitled to use of the rates prescribed in section 1 (b) (1) of the Internal Revenue Code of 1954 [2] for head of a

---

[2] All references are to the Internal Revenue Code of 1954 unless otherwise specified.

household, he must show that he meets the definition of head of a household set forth in section 1(b)(2). That section requires for qualification as head of a household that a person not be married at the close of the taxable year, not be a surviving spouse, and that he either maintain a household which constitutes the principal place of abode of certain individuals described in subparagraph (A) of section 1(b)(2) or maintain a household which constitutes for the taxable year the principal place of abode of his father or mother if he is entitled to a deduction for his father or mother for the year under section 151.

Section 1.1–2(c)(1) of respondent's Income Tax Regulations provides that in order for a taxpayer to qualify as head of a household under section 1(b)(2)(A) as maintaining a household which constitutes for the taxable year the principal place of abode as a member thereof of certain described individuals, it is necessary that the taxpayer and such other person must occupy the household for the entire taxable year. These regulations further provide:

The taxpayer and such other person will be considered as occupying the household for such entire taxable year notwithstanding temporary absences from the household due to special circumstances. A nonpermanent failure to occupy the common abode by reason of illness, education, business, vacation, military service, or a custody agreement under which a child or stepchild is absent for less than six months in the taxable year of the taxpayer, shall be considered temporary absence due to special circumstances. Such absence will not prevent the taxpayer from qualifying as the head of a household if (i) it is reasonable to assume that the taxpayer or such other person will return to the household, and (ii) the taxpayer continues to maintain such household of a substantially equivalent household in anticipation of such return.

The evidence in the instant case is clear that from the time petitioner and Frances were divorced in 1956, Donna had lived with her mother in West Lafayette, Ind. Although at Christmas 1959 Donna and her father were discussing plans for Donna to come to Indianapolis to attend Butler University, it was not contemplated that Donna would come to Indianapolis until after she graduated from high school. From these facts we conclude that petitioner's home was not Donna's principal place of abode as of the beginning of 1960, but that Donna's mother's home was at that time Donna's principal place of abode as it had been for a number of years. Donna did not occupy the household with petitioner for the entire taxable year since she had another principal place of abode at the beginning of the taxable year. Donna was not merely temporarily absent from petitioner's household under any of the circumstances specified in the regulations. Petitioner does not qualify as a head of a household because of Donna's presence in his household during some portion of the year 1960. See *Clair Smith*, 40 T.C. 591 (1963). Petitioner has also failed to establish that his household ever became Donna's principal place of abode during the taxable year 1960. Donna's visits to petitioner while she

was living in a dormitory room at Butler University did not make petitioner's home her principal place of abode. The evidence is insufficient to establish that Donna's mother's home in West Lafayette was not Donna's principal place of abode throughout 1960.

Petitioner's testimony that he could not have Donna with him regularly because of the amount of traveling he did is a clear indication that there was no intention that his home become Donna's principal place of abode even though petitioner did state the conclusion that he understood Donna would live with him while she attended Butler University.

In order to qualify as a head of a household because of maintaining a household for a dependent father or mother, it is not necessary that a taxpayer live in the household with the dependent father or mother, but only that the taxpayer maintain the household. Section 1.1-2(c)(2), Income Tax Regs., provides that temporary absences by reason of illness, vacation, and similar circumstances will not prevent a taxpayer from qualifying as head of a household if it is reasonable to assume that the absent parent will return to the household and the taxpayer continue to maintain such household for the parent. Respondent's regulations further provide that the fact that the father or mother of a taxpayer dies within the taxable year will not prevent the taxpayer from qualifying as head of a household if the household constitutes the principal place of abode of the father or mother for the preceding part of the taxable year.

The evidence shows that the home at Crystal Lake, Ill., constituted the principal place of abode of petitioner's mother and father during the year 1960. The evidence likewise shows that petitioner's mother and father were each a dependent of petitioner in that petitioner furnished over one-half of the support of each of them for the taxable year 1960, and respondent does not contest this fact.

The issue revolves around the question of whether petitioner maintained the household for his father and mother. Respondent's regulations, section 1.1-2(d), provide in part:

*Cost of maintaining a household.* The taxpayer shall be considered as maintaining a household only if he pays more than one-half the cost thereof for his taxable year. The cost of maintaining a household shall be the expenses incurred for the mutual benefit of the occupants thereof by reason of its operation as the principal place of abode of such occupants for such taxable year. The cost of maintaining a household shall not include expenses otherwise incurred. The expenses of maintaining a household include property taxes, mortgage interest, rent, utility charges, upkeep and repairs, property insurance, and food consumed on the premises. Such expenses do not include the cost of clothing, education, medical treatment, vacations, life insurance, and transportation. In addition, the cost of maintaining a household shall not include any amount which represents the value of services rendered in the household by the taxpayer or by a person qualifying the taxpayer as a head of a household.

Without considering any fair rental value of the house at Crystal Lake, which was owned by petitioner's father and mother, the evidence shows that in addition to paying medical bills for his parents in excess of $3,500 in the year 1960, petitioner contributed at least $1,600 toward the other items of the support of his parents including the household expenses, as compared with $1,280.75 which came from social security payments to his parents. Petitioner's mother intermingled these amounts and out of the intermingled funds paid household expenses and certain other items. The testimony of petitioner's mother shows that the money given to her by petitioner was to be used and was used to pay household expenses.

From the evidence we conclude that if no consideration is to be given to the rental value of the house owned by petitioner's parents, petitioner paid more than one-half of the expenses of maintaining his parents' household. Respondent's regulations that the expenses of maintaining a household include property taxes, mortgage interest, rent, utility charges, upkeep and repairs, property insurance, and food consumed on the premises preclude considering the rental value of the house as a part of the cost of maintaining the household. The fair rental value of the house would replace such items as property taxes, mortgage interest, upkeep and repairs, and property insurance. In considering the fair rental value of a house to constitute part of support of an individual for the purpose of determining whether a taxpayer is entitled to a dependency credit under section 151, respondent has in effect stated this to be his position in Rev. Rul. 58–302, 1958–1 C.B. 62.

We consider respondent's regulations to be a reasonable interpretation of the statute and under the criteria set forth in these regulations we conclude that petitioner has established that he paid more than one-half of maintaining the household of his father and mother in the year 1960. In order for a taxpayer to compute his tax as head of a household because of maintaining a household for his mother or father, the mother or father must be a dependent of the taxpayer for whom the taxpayer is entitled to a dependency exemption under section 151. In determining whether a taxpayer contributed over one-half of the support of a parent so as to be entitled to a dependency deduction for such parent under section 151, the fair rental value of the house owned by his parent would be considered as part of the support contributed by the parent for himself. Cf. *Lena Hahn*, 22 T.C. 212 (1954). If the rental value of a house owned by a taxpayer's parents plus the other amounts contributed by such parents to their own support exceed the total contributions by the taxpayer to his parents' support, the parents would not be dependents for whom he was entitled to an exemption under section 151. For this reason such taxpayer would

not meet the definition of head of a household under section 1(b)(2)(B) even though he paid more than one-half the cost of maintaining his parents' household.   In the instant case this is not the situation. It is clear that petitioner contributed over one-half of his parents' support.   The medical expenses paid by petitioner were part of his parents' support, even though such expenses are not part of the cost of maintaining his parents' household.   Since the description of the house in which petitioner's parents lived is sufficient to show that its rental value would not approach the $3,500 in medical expenses which petitioner paid for his parents in 1960, petitioner has clearly established that he is entitled to the dependency exemption for his parents under section 151, thus meeting this portion of the requirement for head of a household contained in section (b)(2)(B).

On the basis of the evidence we hold that petitioner is entitled to compute his tax as head of a household because of maintaining the household for his dependent mother and father until June 1 and for his dependent mother after June 1, 1960.

Out of total claimed travel, entertainment, and promotional expenses in excess of $16,000, respondent disallowed $1,716.98.   We have in the facts set forth some detail as to the items disallowed. Petitioner argues that even though on at least 22 trips to Chicago over weekends he went to Crystal Lake, not more than $79.20 should be disallowed of his travel expenses for Chicago trips.   As we have set forth in our findings, $188.30 of the amounts disallowed by respondent represented gas and oil, tolls and related expenses, except food, for eight trips to and from Chicago over weekends.   There were other weekend trips to Chicago for which petitioner deducted the costs as business expenses, but respondent did not disallow the travel expenses incurred.   On each of at least 22 of these trips petitioner went to Crystal Lake, and it is clear that in some instances the major reason for the trip was to go to Crystal Lake, even though petitioner went on to Chicago and did see certain of the representatives of his principals and take them out to meals.   What business matters petitioner discussed with the representatives of his principals on these occasions, if any, are not shown.

The balance of the items disallowed in connection with petitioner's trips to Chicago, except for $2.50 representing a dinner of an employee with respect to which there is little detail in the record, represented meals for petitioner and representatives of petitioner's principals. Much of this entertainment was over weekends and in many instances included the wives of the representatives of petitioner's principals, and in at least one instance included petitioner's mother.   A large portion of the expense was for taking Don Anderson and his wife to meals.   The evidence shows that petitioner considered the Don Ander-

sons as close personal friends and that he stayed at their home occasionally while in Chicago. The evidence shows that the representatives of his principals whom petitioner entertained also entertained petitioner on an unspecified number of occasions. The record shows that respondent has disallowed in total the claimed entertainment expenses paid by petitioner in entertaining representatives of his principals. Respondent takes the position that petitioner has failed to establish that such entertainment expenses were ordinary and necessary business expenses as distinguished from personal expenses of entertaining personal friends. Petitioner has shown that his business relationships with his principals were such that it would be ordinary and necessary to entertain occasionally representatives of his principals. Weighing heavily against petitioner for failure of more precise proof, we have found that to the extent of $214, the expenses of entertaining his principals represented ordinary and necessary business expenses of petitioner. The balance of the amount spent by petitioner for entertainment of business representatives of his principals was properly disallowed by respondent. See *Rodgers Dairy Co.*, 14 T.C. 66, 74 (1950). Cf. *James Schulz*, 16 T.C. 401 (1951).

Petitioner has failed to show that at least 25 percent of the total bills for various dinners and luncheons in Indianapolis, Ind., mostly on weekends, was not applicable to food and drinks for himself and personal friends or members of his family. As petitioner points out, the provisions of section 274 detailing certain expenses which are not allowable deductions for entertainment are not applicable for taxable years ending prior to December 31, 1962. However, under provisions of the Internal Revenue Code of 1939, similar to section 162 applicable to the year 1960, we have held that costs of meals for a taxpayer and for members of his family, not constituting travel expenses while away from home, are not deductible. *Al J. Smith*, 33 T. C. 861, 867 (1960), and *Richard A. Sutter*, 21 T. C. 170 (1953).

Since petitioner has not established that the amount disallowed by respondent represented an amount other than meals consumed by petitioner and his personal friends and members of his family, or that in each instance the amount differed from or exceeded that which he would have expended for personal purposes, respondent is sustained in his disallowance of the amount of $511.37 of the amounts claimed to be deductible by petitioner for expenditures in restaurants and similar establishments in Indianapolis, Ind. The vague testimony of petitioner as to costs of groceries for meals for himself is unpersuasive as to what petitioner's personal expenses in Indianapolis for weekend meals for himself, his personal friends, and family might have been.

The representatives of customers to whom petitioner sent the steaks and Polaroid film for which he paid a total amount of $205.94 were not

close personal friends of petitioner. The evidence shows that some of these items were sent to the representatives of petitioner's customers primarily because of petitioner's business relationship with these individuals. A personal gift is not an ordinary and necessary expense of carrying on a trade or business, but where expenditures for gratuities bear a proximate relationship to a taxpayer's business and are for the promotion of that business, they may be deductible even though voluntarily made. See *Olivia de Haviland Goodrich*, 20 T.C. 323, 332 (1953). Petitioner's gifts of steaks to his customers' representatives whom he asked to dinner but who were unable to go, in effect represented an expenditure similar to entertainment for customers and as such meets the test of ordinary and necessary expenses in the business in which petitioner was engaged. The evidence establishes that petitioner is entitled to deduct as a business expense this expenditure of $107. The Christmas gifts here involved were to two representatives of a customer of petitioner and the $43 cost thereof was not excessive. The evidence is sufficient to establish that these gifts were of a type customary in petitioner's business and that the expenditure constituted an ordinary and necessary business expense. The only evidence with respect to the $55.94 expenditure for Polaroid film in April 1960 is that petitioner gave such film to two representatives of a customer. Petitioner made no showing of the reason or occasion for the gift. There is nothing in the record to show that gifts of this type were customary in petitioner's business. If it were in the nature of payment to the recipients thereof for services rendered to petitioner, petitioner has not so shown. Cf. *Commissioner* v. *Duberstein*, 363 U.S. 278 (1960). We therefore sustain respondent's disallowance of petitioner's claimed deduction of this $55.94 for failure of proof on the part of petitioner.

*Decision will be entered under Rule 50.*