ALLAN L. BLAIR AND JOCELYN BLAIR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5701-72.    Filed November 18, 1974.

*Milton A. Levenfeld* and *Donald A. Statland,* for the petitioners.

*Allan E. Lang,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined deficiencies in Federal income taxes of $2,624.45 for Allan L. Blair for 1967 and $5,842.58 for Allan L. and Jocelyn Blair for 1968. Due to concessions, two issues remain for decision: (1) Whether, during 1967, Lawrence Blair had his principal place of abode with his father;

---

[24] See S. Rept. No. 1983, 85th Cong., 2d Sess. (1958), 1958-3 C.B. 993,994.

and (2) whether Mr. and Mrs. Blair made a charitable contribution during 1968 when they transferred to the University of Illinois title to the property which had been acquired by means of a tax deed.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Allan L. and Jocelyn Blair, are husband and wife who maintained their legal residence in Chicago, Ill., at the time of filing their petition herein. He filed his individual Federal income tax return for the year 1967 with the district director of internal revenue, Chicago, Ill. They were married in 1968 and filed their joint Federal income tax return for that year with the district director of internal revenue, Chicago, Ill. Mr. Blair will sometimes be referred to as the petitioner.

Until April 10, 1967, the petitioner was married to Judith K. Blair. They had three children: Lawrence, Janice, and Elizabeth. In 1964, upon the advice of a psychiatrist, Lawrence was first enrolled in Grove School, Madison, Conn., which is a prep school for emotionally disturbed children. Lawrence continued to be enrolled there from 1964 through 1967, receiving treatment for emotional problems. Lawrence and his mother had a highly antagonistic relationship which at least contributed to his emotional problems.

On March 16, 1967, the petitioner and Judith Blair signed a property settlement agreement. The petitioner is himself an attorney and was represented by counsel in the drafting of the property settlement. The lengthy agreement provided a comprehensive plan for the separation of the parties. Among other things, the petitioner agreed to make payments to Judith for the support of their children. The agreement also provided:

### (5) CUSTODY AND VISITATION

5.1 JUDITH shall have the care, custody and control of the minor children of the parties hereto.

5.2 The parties hereto shall at all times confer with each other with respect to the continuation of enrollment of LAWRENCE M. BLAIR at Grove School, or any other educational institution; however, it is agreed that in all cases of dispute, ALLAN shall have full and final discretion and control as to LAWRENCE's placement in Grove School or any other educational institution.

The petitioner was allowed reasonable visitation rights, including middle-of-the-week evenings, overnight visitations, and residency during part of the summer and other school vacations. The agreement also provided that Judith and the children were to occupy the marital home. The petitioner signed the property settlement agreement and swore under oath that he had read it and understood its contents.

On April 10, 1967, a decree of divorce was entered in the Circuit Court of Cook County, Ill., dissolving the marriage of the petitioner and Judith Blair. The court incorporated the terms of the property settlement agreement into the divorce decree. It also made the following finding of fact:

10. Two of the minor children of the parties hereto, namely: JANICE L. BLAIR and ELIZABETH A. BLAIR, reside with * * * [Judith Blair], and LAWRENCE M. BLAIR, the minor child of the parties hereto, is enrolled and in residency in Grove School, Madison, Connecticut, and the above mentioned Property Settlement Agreement has proper and adequate provision for LAWRENCE's renewal of residency with * * * [Judith Blair].

The petitioner remained unmarried for the balance of 1967. During that year, he furnished the entire cost of maintaining an apartment in Chicago which was his actual home. A separate room in the apartment was maintained for his son, Lawrence, who kept his at-home clothing at that apartment. During those periods when Lawrence was on vacation from Grove School, he actually resided with the petitioner in his apartment. The only exception was when Lawrence and the petitioner took a trip together for a week. The petitioner furnished all of Lawrence's support during 1967, including tuition at Grove School which was approximately $16,000. Lawrence resided with the petitioner on his vacations because of his antagonistic relationship with his mother.

In early 1968, while preparing the petitioner's 1967 Federal income tax return, his accountant, after examining the petitioner's divorce decree, questioned his filing as a head of household. The petitioner met with his former wife to discuss the custody of Lawrence, and an agreement was reached to change the decree.

On March 26, 1968, an order was entered in the Circuit Court of Cook County, Ill., upon stipulation of the parties, that the first

paragraph of paragraph 5 of the decree of divorce entered April 10, 1967, be amended to read as follows:

[Judith Blair] shall have the care, custody and control of the minor children of the parties hereto, JANICE L. BLAIR and ELIZABETH A. BLAIR, and * * * [Allan Blair] shall have the care, custody and control of the minor child of the parties hereto, LAWRENCE M. BLAIR, so long as the said LAWRENCE M. BLAIR shall be enrolled at Grove School, or such other and similar educational institution requiring his residency away from the County of Cook; provided, however, that in the event said child shall resume full time physical residency in the County of Cook, * * * [Judith Blair] shall thereafter have the care, custody and control of said minor child, in accordance with the provisions of said Decree. Nothing herein provided shall in any way change, modify or alter any of the provisions of said Decree, including but not limited to Paragraphs 2, 3 and 7.

In a handwritten notation at the end of the order, initialed by the petitioner and Judith Blair, was this statement: "This order is enter *nunc pro tunc* as of April 10, 1967."

On July 14, 1965, the board of trustees of the University of Illinois, a public corporation (the university), filed a petition for condemnation in the Circuit Court of the Sixth Judicial District, Champaign County, Ill. (the Circuit Court). The university sought to acquire property in the city of Urbana described as "Lot Twenty-two (22) in University Addition to the City of Urbana, situated in the City of Urbana, in the County of Champaign and State of Illinois" (lot 22). It needed the property as part of a tract it was acquiring upon which a center for the performing arts was to be constructed. The project was to cost in excess of $20 million. The defendants named in the condemnation petition were: the record owners, Lawrence and Dorothy Ostema; the mortgagees, First Federal Savings & Loan Association of Champaign and the University of Illinois Employees' Credit Union; the holder of a deed of trust on the property, E. E. Latowsky; and various tenants. The county collector of Champaign County (the county collector) was not made a party to the action. The university filed a lis pendens notice in the office of the recorder of Champaign County at the same time the condemnation petition was filed.

Some or all of the real estate taxes assessed against lot 22 for 1964 were not paid and became delinquent in 1965. On October 13, 1965, lot 22 was sold by the county collector at public auction to Interstate Bond Co. (Interstate). Interstate paid the county collector the unpaid taxes and received a certificate of purchase.

Interstate is a corporation whose principal business is purchasing delinquent property at tax sales.

On June 30, 1966, the Circuit Court entered a judgment order granting the university's petition for condemnation. The property was valued at $62,000. The university deposited this amount with the county treasurer of Champaign County (the county treasurer) by July 18, 1966, thereby obtaining title to lot 22.

On July 18, 1966, the Circuit Court entered an order directing disbursement of the money held by the county treasurer as follows: (1) To First Federal Savings & Loan Association of Champaign, $17,884.02; (2) to E. E. Latowsky, trustee, $19,133.28; (3) to the county collector, 1965 real estate taxes on lot 22 and a pro rata share of 1966 real estate taxes prorated as of July 18, 1966; and (4) to Lawrence and Dorothy Ostema, the balance of the proceeds.

On April 29, 1968, Interstate filed a petition in the Circuit Court seeking to have its certificate of purchase converted into a tax deed if redemption was not made on or before August 26, 1968. No redemption was made. On or about August 26, 1968, Interstate transferred the certificate of purchase to the petitioner, who paid $630.97 for it on October 1, 1968. The petitioner and Interstate had had frequent business dealings in the past. Those dealings included the petitioner purchasing unredeemed certificates of purchase from it for the redemption price. He also had performed legal services for Interstate. In early October 1968, a hearing was held in the Circuit Court on the petition of John Allan Co. for a tax deed to lot 22. It is a closed corporation wholly owned and operated by the petitioner, and later he was substituted for the corporation. At first, the Circuit Court directed the issuance of a tax deed to the petitioner. When he attempted to have the county clerk issue him the tax deed, the petitioner discovered that he did not have the certificate of purchase which was required to obtain the tax deed. He sought to have the Circuit Court issue an order dispensing with the need to tender the certificate of purchase. Upon the advice of the State's attorney, the proceedings were continued until October 24, 1968, in order to give the university an opportunity to object, and the prior order was vacated.

On October 22, 1968, the university filed objections to the issuance of the tax deed. It claimed that any rights the petitioner

had as a result of his certificate of purchase related solely to the funds which it had paid to the county treasurer for the property, and not to the land.

At some time prior to October 24, 1968, an agreement was reached between the petitioner and the university. The petitioner, an alumnus of the university, agreed to donate lot 22 to it if it would withdraw its objections to his petition for a tax deed. At the hearing on October 24, 1968, the university did so, and the Circuit Court entered an order directing the county clerk to issue a tax deed. It was understood by the Circuit Court that the petitioner was immediately to transfer lot 22 to the university. The county clerk then issued the tax deed, and on the same day, the petitioners, by warranty deed, conveyed lot 22 to the university. The fair market value of lot 22 on October 24, 1968, was not less than $61,000.

On his 1967 individual Federal income tax return, the petitioner computed his tax liability by using head-of-household rates. On their 1968 joint Federal income tax return, the petitioners claimed they made a charitable contribution of $61,000 by reason of their conveyance of lot 22 to the university.

In his notice of deficiency, the Commissioner determined that the petitioner was not entitled to compute his taxes for 1967 by using the head-of-household rates and recomputed his tax at rates applicable to unmarried individuals. The Commissioner also determined that the petitioners were not entitled to a charitable deduction for 1968 by reason of the conveyance of lot 22 to the university.

### OPINION

For 1967, section 1(b)(2) of the Internal Revenue Code of 1954 [1] provided in pertinent part:

(2) DEFINITION OF HEAD OF HOUSEHOLD.—For purposes of this subtitle, an individual shall be considered a head of a household if, and only if, such individual is not married at the close of his taxable year, is not a surviving spouse (as defined in section 2(b)), and either—

(A) maintains as his home a household which constitutes for such taxable year the principal place of abode, as a member of such household, of—

(i) a son * * *

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated, and references to sec. 1(b)(2) are to that provision as in effect during 1967.

The petitioner was unmarried at the end of 1967, was not a surviving spouse, and maintained a household as his home. The first issue to be decided is whether that home was the principal place of abode of his son, Lawrence.

When the head-of-household provisions were first enacted, it was recognized that a child might have his principal place of abode with a parent, even though the child was away at school during much of the year.

Section 12(c) [I.R.C. 1939] is intended to apply only where the taxpayer and such other members of the household live together in such household during the entire taxable year (except for temporary absences due to special circumstances). The fact that a child may be at college during the college term does not prevent the home of the taxpayer from also constituting the principal place of abode of the child. However, such home will not be considered as the principal place of abode where the child establishes a separate habitation and only returns for periodic visits. Similarly, such home will not be considered as constituting the principal place of abode of a dependent of the taxpayer who is supported by the taxpayer for a substantial part of the year in lodgings other than those occupied by the taxpayer even though such person may at various periods live in the household, *unless the residence of the dependent in other lodgings is not permanent and is due to necessity such as illness.* * * * [H. Rept. No. 586, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 434. Emphasis added.]

The same principles have been expressed in the regulations. For 1967, section 1.1-2(c)(1) of the Income Tax Regulations provided in part:

The taxpayer and such other person will be considered as occupying the household for such entire taxable year notwithstanding temporary absences from the household due to special circumstances. A nonpermanent failure to occupy the common abode by reason of illness, education, business, vacation, military service, or a custody agreement under which a child or stepchild is absent for less than 6 months in the taxable year of the taxpayer, shall be considered temporary absence due to special circumstances. Such absence will not prevent the taxpayer from qualifying as the head of a household if (i) it is reasonable to assume that the taxpayer or such other person will return to the household, and (ii) the taxpayer continues to maintain such household or a substantially equivalent household in anticipation of such return.[2]

When Lawrence was at school, he was there temporarily—to receive an education and to receive psychiatric care, and the school was not his principal place of abode. Compare *James J. Prendergast,* 57 T.C. 475 (1972), affd. 483 F. 2d 970 (C.A. 9, 1973); *Donald G. Teeling,* 42 T.C. 671 (1964). Legal custody of a child is not determinative of the principal place of abode of the

---

[2] These provisions now appear in sec. 1.2-2(c)(1), Income Tax Regs.

child. Compare *Alex A. Ruff,* 52 T.C. 576 (1969); *Donald G. Teeling, supra.* Irrespective of whether the 1968 amendment of the divorce decree is given effect nunc pro tunc, it is clear that during 1967, Lawrence was not expected to live with his mother when he was not in school, but was expected to live with his father at such times. He could not reside with his mother because of the hostility existing between him and her. The only suitable place for him to reside at such times was with his father, and his father maintained a room for him, where his clothes and other things were stored. Under such circumstances, we are satisfied that Mr. Blair's home was the principal place of abode of Lawrence during 1967.

According to the amended divorce decree, his mother was to have custody of Lawrence when he completed his stay at the Grove School and returned to Cook County. Yet, those events did not occur in 1967, and the possibility of their occurring at some future time does not alter the fact that in 1967, Lawrence returned to the home of his father when he was not at school. Accordingly, we hold that Mr. Blair's home was the principal abode of Lawrence during 1967 and that the petitioner is entitled to compute his tax liability for that year by use of the rates applicable to a head of household.

The second issue we must decide is whether the petitioners made a charitable contribution to the university in 1968, and if so, its value. The petitioners executed and delivered a warranty deed purporting to convey lot 22 to the university. However, they are entitled to a charitable contribution deduction for the value of the land only if they actually had title to convey.

When the Circuit Court directed that a tax deed be issued to the petitioner, it did so pursuant to an agreement between him and the university settling their controversy over the title to the land, and without passing on the merits of the petitioner's claim. Thus, the Circuit Court did not thereby determine that the petitioner had title to the property. In any event, it would be necessary for us to decide whether the petitioner had such an interest in the property as to entitle him to a charitable contribution deduction for its value. *Commissioner v. Estate of Bosch,* 387 U.S. 456 (1967); *Greene v. United States,* 476 F. 2d 116 (C.A. 7, 1973); *Estate of Abraham Hamelsky,* 58 T.C. 741 (1972). We must decide whether the petitioner was entitled to a tax deed for lot 22.

Real estate taxes in Illinois become a lien on property on January 1 of the year in which they are levied; the lien is in favor of the State of Illinois. Ill. Ann. Stat. ch. 120, sec. 697 (Smith-Hurd 1970). The taxes become delinquent in the succeeding year if not paid. Ill. Ann. Stat. ch. 120, sec. 705 (Smith-Hurd 1970). After they become delinquent, the property may be sold at a tax foreclosure sale. The successful bidder must pay the delinquent taxes to the county collector, who then issues a certificate of purchase. The certificate is freely assignable. Ill. Ann. Stat. ch. 120, sec. 729 (Smith-Hurd 1970). Interested parties have a right to redeem the property within a 2-year period. Ill. Ann. Stat. ch. 120, sec. 734 (Smith-Hurd 1970). Once this period for redemption expires, the holder of the tax certificate may petition the Circuit Court for an order directing the county clerk to issue a tax deed for the property. If the Circuit Court finds that the statutory procedures have been followed, it must issue the requested order. Ill. Ann. Stat. ch. 120, sec. 747 (Smith-Hurd 1970).

On the other hand, when property is condemned under Illinois law, the condemner's title relates back to the date the petition for condemnation was filed. *Board of Junior College, District 504 v. Carey,* 43 Ill. 2d 82, 250 N.E. 2d 644 (1969); *City of Chicago v. R.R. Bldg. Corp.,* 24 Ill. 2d 20, 179 N.E. 2d 623 (1962). In *Delano, Inc. v. Arnold,* 46 Ill. 498, 501, 263 N.E. 2d 830, 831 (1970), certiorari denied 401 U.S. 994 (1971), the Illinois Supreme Court said:

> After an eminent domain proceeding has been completed and the award deposited with the county treasurer it is impossible for a tax deed to convey merchantable title. It is also impossible for the tax purchaser or his assignee to be put in possession of the property. The completion of the eminent domain proceeding thus of necessity terminates the right of the tax buyer to receive a tax deed. * * *

In that case, the tax purchaser argued that since the property had not been redeemed, he was entitled to it, but the court rejected such argument and held that his only claim was against the funds paid into court for the condemnation.

The petitioner claims that the *Delano* holding is not applicable in this case because the county collector was not given notice of the commencement of the condemnation proceedings. He argues that because of the failure to give such notice to the county collector, the condemnation proceedings are totally void insofar

as he is concerned and that he was entitled to a tax deed to the property. For several reasons, we are not convinced by his arguments.

In an eminent domain proceeding, the statute provides that all persons interested in the condemned property as owners or "otherwise as appearing of record" must be joined as parties. Ill. Ann. Stat. ch. 47, sec. 2 (Smith-Hurd 1969). The interest of a person not given notice of the proceeding is not affected by condemnation. *Chicago & N.W. Ry. Co. v. Miller,* 251 Ill. 58, 95 N.E. 1027 (1911); *Sanitary Dist. of Chicago v. Metropolitan W.S. E. Ry. Co.,* 241 Ill. 622, 89 N.E. 800 (1909); *Calumet River Ry. Co. v. Brown,* 136 Ill. 322, 26 N.E. 501 (1891). There are no Illinois cases passing on the question as to whether the county collector must be given notice, but in our opinion, he need not be given such notice.

Real estate taxes in Illinois are collected by the county collector. Ill. Ann. Stat. ch. 120, sec. 671 (Smith-Hurd 1970). The counties act as fiscal agents of the State in collecting real estate taxes. See *People v. Nash,* 364 Ill. 224, 4 N.E. 2d 101 (1936). After collecting the taxes, the county collector pays the State's share over to the State treasurer. Ill. Ann. Stat. ch. 120, sec. 778 (Smith-Hurd 1970). If the real estate taxes are not paid within the required period, a lien on the property may be foreclosed in the name of the "People of the State of Illinois." Ill. Ann. Stat. ch. 120, sec. 697 (Smith-Hurd 1970).

Under the then applicable law in Illinois, the State could not have been made a party defendant in the condemnation proceeding.[3] It is an unnecessary and improper party in a condemnation proceeding. See *People v. Sanitary Dist. of Chicago,* 210 Ill. 171, 71 N.E. 334 (1904). As an agent of the State, the county collector was likewise immune from suit. Cf. *Posinski v. Chicago, M. St. P. & Pac. R. Co.,* 376 Ill. 346, 33 N.E. 2d 869 (1941). State property cannot be condemned.

Moreover, when land has been condemned and the amount of compensation determined, the award is deposited with the county treasurer. Ill. Ann. Stat. ch. 47, sec. 14 (Smith-Hurd 1969). The treasurer then pays the award to the various parties entitled thereto. In Champaign County, the county treasurer is the county collector. Ill. Ann. Stat. ch. 120, sec. 657 (Smith-Hurd

[3] "The state of Illinois shall never be made defendant in any court of law or equity." Ill. Const. art. 4, sec. 26 (1870).

1970). Collecting taxes is merely another duty of the county treasurer. See *Kilgore v. People,* 76 Ill. 548 (1875). Thus, since the county treasurer receives the entire proceeds from the condemnation award, the interests of the State are adequately protected through his possession of the condemnation award. For example, in this case, the county collector was awarded back taxes for 1965 and 1966 in the condemnation proceeding even though he was not a party to the action.

In the light of these principles, we conclude and hold that there was no need to make the county collector a party to the condemnation proceeding brought by the university. The lien for taxes survived notwithstanding that proceeding, but it became a lien on the funds paid into court for the condemnation. See *City of Chicago v. Salinger,* 384 Ill. 515, 52 N.E. 2d 184 (1943). There was no right to demand a tax deed to lot 22. See *Delano, Inc. v. Arnold,* 46 Ill. 498, 263 N.E. 2d 830 (1970).

Furthermore, the petitioner cannot complain because neither he nor Interstate were made parties to the condemnation proceeding. They had no interest in lot 22 when the petition to condemn was filed. At the time of filing such petition, the university also filed a lis pendens notice with the recorder's office, and that action gave constructive notice of the condemnation proceeding to any person who thereafter acquired any interest in lot 22. Thus, at the time Interstate acquired its tax certificate, it had constructive notice of the condemnation proceeding and could have asserted its rights in the condemnation proceeding through a cross petition. See Ill. Ann. Stat. ch. 47, sec. 11 (Smith-Hurd 1969). In like manner, the petitioner, when he acquired the tax certificate from Interstate, was under constructive notice of the pending condemnation proceeding, and his rights were no greater than his assignor. In our opinion, he was not entitled to a tax deed. Cf. *City of Chicago v. Salinger, supra.*

In the alternative, the petitioner argues that regardless of the ultimate merits of his claim, it had a considerable value in 1968; he asserts that because of the university's need for lot 22, it would have paid a substantial amount to bring about a settlement and to avoid protracted litigation. However, the university secured a settlement without in fact paying anything for the property. The petitioner has a far rosier view of the merits of his claim than we do, and there is no reason to believe that the

university considered it any serious threat to its title to lot 22. As the successor to the interest of the county collector, the petitioner had at most a claim for the amount of delinquent taxes, and although there is some doubt as to whether the university had a liability to pay him even that amount, it might have been willing to do so in order to avoid further controversy. Accordingly, we hold that the petitioner is entitled to deduct as a charitable contribution the amount of his tax certificate as a result of his deed to the university.

*Decision will be entered under Rule 155.*

