*Decision will be entered under Rule 50.*

W. B. COUNTS AND MILDRED P. COUNTS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1184–62. Filed July 23, 1964.

**756**

*S. P. Keith, Jr.*, for the petitioners.

*Robert G. Faircloth*, for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioners' income tax for 1960 in the amount of $492.53.

The issues for decision are:

■ Whether petitioners are entitled to an exemption deduction for petitioner W. B. Counts' mother, Amizona Counts (hereinafter referred to as Amizona), under section 151, I.R.C. 1954;[1] and

■ The amount of the deduction to which petitioners are entitled for medical care for themselves, for Amizona, and for petitioner W. B. Counts' father, R. H. Counts (hereinafter referred to as Homer).

Respondent concedes that Amizona and Homer were over 65 years of age in 1960, that they were both dependents of petitioners within the meaning of sections 152 (defining dependents) and 213 (medical expense deduction), and that therefore petitioners are entitled to deduct as medical expenses amounts spent in 1960 for medical care for Amizona and Homer. Respondent did not disallow the exemption deduction for Homer claimed on petitioners' return, but determined that petitioners were not entitled to an exemption deduction for Amizona because she had gross income of $600 or more in 1960.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners are husband and wife who resided in Birmingham, Ala., in 1960. They filed a joint Federal income tax return for the taxable year 1960 with the district director of internal revenue, Birmingham, Ala. Petitioner Mildred P. Counts is involved herein merely because a joint return was filed; hereinafter W. B. Counts will be referred to as petitioner.

For the taxable year 1960 petitioners reported adjusted gross income in the amount of $10,823.22. In their Federal income tax return for that year they claimed exemptions for petitioner's parents, Amizona and Homer, and they claimed itemized deductions from adjusted gross income, one of which was for medical and dental expenses in the total amount of $3,351.43.[2]

In 1955 Amizona, who was then 68 years old, and Homer, who was then 69 years old, were living on a farm in a rural area in Franklin County, Ala., about 14 miles from Russellville. Amizona owned an

---

[1] Statutory references are to the Internal Revenue Code of 1954 except as noted.

[2] Before reduction of 3 percent of adjusted gross income, $324.70.

undivided one-half interest in the farm. In that year Amizona suffered a stroke; and in 1957 she suffered a second stroke, leaving her paralyzed. Petitioner hired a woman to stay with his parents on the farm, to nurse Amizona and to care for both Amizona and Homer, but his parents' physician, who maintained his office in Russellville, advised petitioner to move Amizona to a place where she could be more conveniently cared for by the physician.

In January 1959, petitioner moved both Amizona and Homer to the Franklin County Nursing Home in Russellville. The assistant administrator of the nursing home was a registered nurse, and the home advertised that it offered "professional nursing care for our geratic people." Throughout 1960 Amizona and Homer stayed at the home, occupying separate beds in the same room, except for periods when they left to receive medical treatment.

Homer suffered from high blood pressure and a gallbladder condition in 1960. In April 1960 petitioner took a vacation from his job, went to Russellville, and persuaded Homer to visit a clinic in Russellville. X-ray and other examinations of Homer's condition were made at this time. Throughout 1960, Homer was generally confined to his bed where he was served meals. He could not bathe himself, and he was cared for by male nurses as part of their daily routine. He was also attended by other nurses from time to time in connection with his ailments. Homer died as a result of the gallbladder condition on April 19, 1961. Amizona died in April 1962.

The Franklin County Nursing Home was not a hospital; neither was it a home for the aged. Patients had available the services of registered and practical nurses. In 1960 Homer was treated by registered nurses at the home for his gallbladder condition.

Petitioner was billed monthly by the home for charges for Amizona and Homer. These bills were itemized for drugs, injections, dressings, and a lump-sum charge for maintenance which included the expenses for nursing services and for room and food.

Through July 1960, both Amizona and Homer received old age assistance from the Department of Pensions and Security of the State of Alabama.[3] These amounts for assistance were paid directly to the nursing home until July 1960 when the assistance was discontinued. Petitioner was given credit for the amounts paid by the department on the bills submitted by the nursing home for care for Amizona and Homer.

---

[3] Or the Department of Pensions and Security for Franklin County, Ala.

Amounts charged by the nursing home for Amizona's and Homer's care during 1960, and the amounts paid by petitioner therefor, were as follows:

AMIZONA

| Drugs | Maintenance | | Total | Paid by petitioner |
|---|---|---|---|---|
| | | | | [1] $81. 62 |
| $158. 30 | $145 | (Feb.) | $303. 30 | 180. 30 |
| 182. 72 | 145 | (Mar.) | 327. 72 | 204. 72 |
| 196. 39 | 145 | (Apr.) | 341. 39 | 213. 39 |
| 136. 12 | 145 | (May) | 281. 12 | 153. 12 |
| 95. 68 | 145 | (June) | 240. 68 | 112. 68 |
| 125. 74 | 145 | (July) | 270. 74 | 142. 74 |
| 97. 76 | 145 | (Aug.) | 242. 76 | 242. 76 |
| 52. 15 | 145 | (Sept.) | 197. 15 | 197. 15 |
| 57. 00 | 145 | (Oct.) | 202. 00 | 202. 00 |
| 37. 50 | 145 | (Nov.) | 182. 50 | 182. 50 |
| 59. 50 | 145 | (Dec.) | 204. 50 | 204. 50 |
| 1, 198. 86 | | | | 2, 117. 48 |

HOMER

| Drugs | Maintenance | | Total | Paid by petitioner |
|---|---|---|---|---|
| | | | | [1] $35. 14 |
| $9. 43 | $115 | (Feb.) | $124. 43 | 35. 43 |
| 3. 64 | 115 | (Mar.) | 118. 64 | 29. 64 |
| 2. 34 | 115 | (Apr.) | 117. 34 | 24. 34 |
| 2. 34 | 115 | (May) | 117. 34 | 24. 34 |
| | 115 | (June) | 115. 00 | 22. 00 |
| | 115 | (July) | 115. 00 | 22. 00 |
| | 125 | (Aug.) | 125. 00 | 125. 00 |
| | 135 | (Sept.) | [2] 135. 00 | 135. 00 |
| | 135 | (Oct.) | 135. 00 | 135. 00 |
| | 135 | (Nov.) | 135. 00 | 135. 00 |
| | 135 | (Dec.) | 135. 00 | 135. 00 |
| 17. 75 | | | | 857. 89 |

Evidence shows only the amount paid by petitioner for January.
Homer's disposition and attitude were the reasons given petitioner for the raise in charges in August.

The amounts of the nursing home charges not paid by petitioner were covered by the old-age assistance payments.

In addition to the foregoing amounts paid by petitioner to the nursing home, during 1960 petitioner paid a total of $39 for Homer's expenses and doctor bills in connection with the diagnosis and treatment of the gallbladder condition in April 1960; he paid a $20 fee to a skin specialist to treat Amizona; and in connection with an operation to remove Amizona's leg in July 1960 he paid $4 for ambulance service, $23.75 for nursing services, and $92.81 for Amizona's hospitalization.

Petitioners also paid $5 for dental service to themselves, and $79.80 as a premium for hospitalization insurance for themselves, in 1960.

During 1960 Amizona received rentals for her interest in the farm in the amount of $200-$300. These rental payments and the old-age assistance payments were the only income received by or for Amizona and Homer in 1960, except as hereafter mentioned.

Under date of June 10, 1960, Amizona, joined by Homer, executed and acknowledged a deed conveying her undivided one-half interest in the farm to her son, Hoyt Counts, who owned the other one-half interest in the farm, for a stated consideration of "Ten DOLLARS and other valuable consideration." The deed was executed in Amizona and Homer's room at the nursing home in the presence of Hoyt and two unrelated witnesses, who were asked by Hoyt to witness and acknowledge Amizona's and Homer's signatures, which they did. The deed was recorded, and attached to it were Federal documentary stamps totaling $7.70. Petitioners were not present when the deed was signed and were apparently unaware of the transaction until several months later.

Respondent determined that, for 1960, petitioners are entitled to a deduction for medical and dental expenses computed as follows:

| | | |
|---|---|---|
| Drugs verified | $1, 225. 87 | |
| Less 1% [of adjusted gross income] | 108. 23 | |
| Allowable drugs | 1, 117. 64 | |
| Other expenses verified and allowed for [Amizona] | 859. 00 | (Economic dependent) |
| Total allowed as medical expenses | 1, 976. 64 | |
| Medical claimed | 3, 026. 73 | |
| Adjustment to medical [disallowed] | 1, 050. 09 | |

ULTIMATE FINDINGS

A principal reason for Homer's presence in the Franklin County Nursing Home during 1960 was the availability there of facilities for medical care, including nursing services and attention, for him. His maintenance at the home during 1960, including meals and lodging, was a necessary incident to his receiving medical care at the home, which was required for him throughout 1960.

Petitioners' expenditures for drugs and medical and dental care for themselves, for Amizona, and for Homer during 1960 totaled $2,399.59, not including amounts spent for Homer's maintenance at the nursing home, which totaled $840.14.

The first issue for decision is whether petitioner is entitled to an exemption deduction for his mother, Amizona, for the taxable year 1960.

Respondent recognizes that Amizona was a dependent of petitioner within the meaning of section 152 and allowed petitioner, as a medical expense deduction for 1960, the amounts which respondent determined petitioner spent for Amizona's medical care in that year. See sec. 213 (a) (1) (A) and sec. 1.213–1(a) (3) (i), Income Tax Regs. Amizona was over 65 years of age in 1960, and, pursuant to the foregoing provisions of the Code and regulations, petitioner is entitled to deduct as medical expenses the amounts which he spent for Amizona's medical care despite the fact that she may have had gross income of $600 or more in 1960, since it is admitted that petitioner furnished over one-half of her support and that she otherwise qualified as petitioner's dependent. As respondent stated in the notice of deficiency, she was petitioner's "Economic dependent."

But for petitioner to be entitled to an exemption deduction for Amizona she must have had gross income of less than $600 in 1960. Sec. 151(e) (1) (A). Respondent determined that Amizona had gross income in excess of $600 in that year; therefore, the burden of proof is upon petitioner to demonstrate that Amizona had gross income of less than $600 in 1960.

The issue turns on whether Amizona realized capital gain in 1960 on the sale of her one-half interest in the farm which, when added to her rental income, equaled $600 or more.[4] We are satisfied that the rental income was the only gross income received by Amizona in 1960 other than any gain she may have realized from the sale of the one-half interest in the farm, and respondent does not contend otherwise.

Under date of June 10, 1960, Amizona executed a deed conveying her interest in the farm to her son, Hoyt. The stated consideration was "Ten DOLLARS and other valuable consideration," and Federal documentary stamps attached to the deed indicate a consideration of between $6,500 and $7,000. If Amizona did, in fact, receive $6,500 for her interest in the farm in 1960, we must hold for respondent on this issue because petitioners, who had the burden of proof, produced no evidence as to Amizona's basis in the property from which we could determine whether she realized a gain or a loss on the transaction or the amount thereof. This infirmity in the proof must bear against petitioner.

There is no direct evidence in the record whether Amizona did or did not receive any money or property in 1960 as a result of the sale.

---

[4] Respondent makes no contention that the old-age assistance payments were includable in Amizona's gross income.

Petitioner testified that she did not to his knowledge—but he was not present and was apparently unaware of the transaction until several months after the deed was executed. The documentary stamps on the deed indicate that the consideration paid was $6,500 to $7,000, but we would not accept this as conclusive proof of either the amount of actual consideration or that it was in fact paid in 1960; see *J. F. S. Crayton*, 11 B.T.A. 1375 (1928); *W. A. Bahr*, 10 B.T.A. 637 (1928), particularly since the transaction was between related parties.

On the other hand, petitioner alleged in his amended petition that his parents sold their interest in the farm in 1960 for $6,500, and respondent admitted the allegation in the answer. However, we would hesitate to accept even this at face value because petitioner, in documents entitled "petitions," which he prepared and filed himself, has indicated that he was not fully aware of the issues involved and has alleged many extraneous and irrelevant facts without regard to their significance.

But the record does contain circumstantial indications that Amizona received money or property of value upon the sale on June 10, 1960. Amizona and Homer were both receiving old-age assistance from the State of Alabama in 1960. In order that they qualify for this assistance, it was necessary that they not have "sufficient income and resources from all sources to provide a reasonable subsistence compatible with decency and health." Ala. Code tit. 49, sec. 17(14) B.(b) (1958). If they came into possession of "income or resources" other than that which they possessed when they applied for the assistance, it was their duty to report the fact to the Department of Pensions and Security and the duty of the department to continue, reduce, or cancel the assistance after an investigation. Ala. Code tit. 49, sec. 17(17) (1958). After July 1960, neither Amizona nor Homer received old-age assistance. The payments may have been discontinued because they came into possession of "income or resources," perhaps as the result of Amizona's sale of the property.

The evidence is not conclusive. Hoyt, who should have been in the best position to testify both as to the amounts he paid Amizona and as to her basis in the property, being the owner of the other one-half interest, was not called as a witness. We do not know what Amizona might have done with $6,500 had she received it. Nevertheless the evidence indicates that Amizona did, in fact, sell her property in 1960 and that she probably received money or property having a fair market value therefor.

On the record we must conclude that petitioner has failed to prove that Amizona had gross income of less than $600 in 1960. Respondent's determination must therefore stand, and petitioners are not entitled to an exemption deduction for Amizona in 1960.

The second issue involves the amount of the deduction for medical expenses to which petitioners are entitled. On their return for 1960, they claimed a deduction in the amount of $3,351.43 before reduction for 3 percent of adjusted gross income. Of the total medical expenses claimed by petitioners, respondent disallowed the amount of $1,050.09. Petitioner has adduced testimony, canceled checks, and a record which he maintained to record the amounts and purposes of contributions to his parents' support, and, based on the evidence produced, we have found as a fact that petitioners spent the total amount of $2,399.59 for medical and drug expenses for themselves, for Amizona, and for Homer, not including amounts spent for Homer's maintenance at the nursing home which totaled $840.14. In view of our findings, the only remaining issue is whether petitioners are entitled to deduct this $840.14 as medical expense.

Respondent contends that the amounts which petitioner spent for Homer's maintenance at the nursing home were personal living expenses, merely incidental to medical treatment or care, and that such expenses are not deductible because they are not within the purview of section 213(e)(1)(A), which defines "medical care" as amounts paid "for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body (including amounts paid for accident or health insurance)."

Respondent, citing *Commissioner* v. *Bilder*, 369 U.S. 499 (1962), argues that personal or living expenses, which are incidental to medical treatment or care, are not deductible. The Supreme Court in the *Bilder* case held that living expenses (rental on an apartment occupied by taxpayer, his wife, and daughter) incurred in connection with a stay in Florida where the taxpayer had gone for reasons of health were not medical expenses as defined in section 213(e)(1)(A) of the 1954 Code. The issue there was whether in the light of the addition of subparagraph (B) to the definition of medical care in section 213(e)(1) of the 1954 Code, which specifically included "transportation primarily for and essential to medical care" within the definition of medical care, Congress intended to exclude the cost of meals and lodgings while in a travel status away from home for medical reasons as deductible medical expenses. Decisions under section 23(x) of the 1939 Code, which defined medical care in the same language used in section 213(e)(1)(A) of the 1954 Code but made no specific reference to costs of transportation, had allowed not only the cost of travel primarily for medical care but also the cost of meals and lodgings during such travel as deductible medical expense. The Supreme Court in *Bilder* held that by specifically including the cost of transportation undertaken primarily for medical reasons in the definition of medical care, Congress intended to exclude the cost of meals and lodgings during such travel.

We do not interpret *Bilder* as changing the long-accepted rule that the cost of food and lodging included as a part of a hospital charge is deductible as medical expense. In fact the Court in its opinion relied on the congressional committee reports which state in part: "The subsection [subsec. (e) of sec. 213] is not intended * * * to deny the cost of food or lodging provided as part of a hospital bill." See H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. A60 (1954) ; S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 220 (1954).

The costs of Homer's maintenance at the nursing home, even though these costs included personal living expenses, are not to be disallowed on the authority of *Bilder* alone.

Respondent's regulations also recognize the continued existence of the rule allowing deduction of the cost of meals and lodgings provided as a part of inpatient hospital or institutional medical care. See sec. 1.213–1(e)(1), Income Tax Regs.[5] Respondent relies on the provisions of subdivision (v)(b) in support of his position. However, this subdivision must be read in the context of the entire section, the pertinent parts of which are quoted in the footnote. We have been referred to no authorities involving a construction of these provisions of the regulations and our research has disclosed none, but it is apparent that this regulation is more comprehensive and more specific than those adopted under section 23(x), I.R.C. 1939. See sec. 39.23(x)–1(d), Regs. 118. In summary, the present regulations

---

[5] Sec. 1.213–1(e) *Definitions*—(1) *General.* * * *

\* \* \* \* \* \* \*

(v) The cost of in-patient hospital care (including the cost of meals and lodging therein) is an expenditure for medical care. The extent to which expenses for care in an institution other than a hospital shall constitute medical care is primarily a question of fact which depends upon the condition of the individual and the nature of the services he receives (rather than the nature of the institution). A private establishment which is regularly engaged in providing the types of care or services outlined in this subdivision shall be considered an institution for purposes of the rules provided herein. In general, the following rules will be applied :

(a) Where an individual is in an institution because his condition is such that the availability of medical care (as defined in subdivisions (i) and (ii) of this subparagraph) in such institution is a principal reason for his presence there, and meals and lodging are furnished as a necessary incident to such care, the entire cost of medical care and meals and lodging at the institution, which are furnished while the individual requires continual medical care, shall constitute an expense for medical care. * * *

(b) Where an individual is in an institution, and his condition is such that the availability of medical care in such institution is not a principal reason for his presence there, only that part of the cost of care in the institution as is attributable to medical care (as defined in subdivisions (i) and (ii) of this subparagraph) shall be considered as a cost of medical care ; meals and lodging at the institution in such a case are not considered a cost of medical care for purposes of this section. For example, an individual is in a home for the aged for personal or family considerations and not because he requires medical or nursing attention. In such case, medical care consists only of that part of the cost for care in the home which is attributable to medical care or nursing attention furnished to him ; his meals and lodging at the home are not considered a cost of medical care.

\* \* \* \* \* \* \*

(vi) See section 262 and the regulations thereunder for disallowance of deduction for personal, living, and family expenses not falling within the definition of medical care.

provide that the cost of inpatient hospital care, including the costs of meals and lodging at the hospital, is an expenditure for medical care as that term is defined in section 213 (e) (1) (A). It is recognized that such costs of maintenance at an institution other than a hospital may constitute expenses for medical care; that whether such costs incurred at an institution other than a hospital are deductible as medical expenses is a factual question the answer to which depends not upon the nature of the institution but upon the condition of the person and the care which he receives; that the cost of nursing attention is an expense for medical care; that if a—and we note that the regulations do not require the—principal reason for the person's presence in an institution is the availability of medical care for him, then the costs of meals and lodging, furnished as a necessary incident to such care, for as long as the person requires the care, are deductible; and that, if the availability of medical care is not a principal reason for the person's presence at the institution, the costs of meals and lodging are not deemed expenses for medical care, although, even in this event, the expenses for nursing attention are considered costs of medical care and are deductible. An example in subdivision (v) (b) of the regulations deals with the case of a person who resides at a home for the aged because of personal or family considerations and *not because he requires medical or nursing attention;* in this event, it is provided that the person's costs of meals and lodging are not embraced within the term "medical care" but that his costs of nursing attention are deductible.

Applying these rules to the present case, we conclude that petitioners are entitled to deduct, as medical expenses under section 213, their costs of maintaining Homer at the nursing home in 1960, including the costs of meals and lodging, if the evidence demonstrates that a principal reason for Homer's presence at the home throughout 1960 was to receive medical care, including nursing services and attention at the home, and that such costs were a necessary incident to the care which he received.

Of course, under the foregoing rules the nature of the institution where Homer stayed in 1960 is not determinative of the question, but it does bear on the problem of the principal reasons for Homer's presence there.

The Franklin County Nursing Home was not a hospital and it did not offer hospital facilities. When it was necessary for Homer to have a medical examination and X-rays in 1960, petitioner had to take him to a clinic in Russellville. But the evidence shows that persons at the home had the services of nurses, registered and practical, and that they received injections and drugs that could be administered only on a doctor's prescription by, or under the supervision of, a

nurse.[6] In fact, respondent impliedly concedes that it was possible to receive necessary medical care at the home by admitting that petitioners are entitled to deduct, as medical expenses, the entire costs of maintaining Amizona at the home in 1960. Compare *Martin J. Lichterman*, 37 T.C. 586 (1961).

Respondent maintains that Homer's presence at the home was an incident to Amizona's presence there, that it was not required by his condition, and that it merely suited family convenience that Homer be with Amizona, who respondent admits had to be at the home or some similar institution.

It is true that Homer's presence at the home was probably related to Amizona's presence there. But, while petitioner and his family may have decided that putting both Amizona and Homer in the home was the best solution to a difficult problem, we do not believe that convenience alone was the only or even the most important reason for placing Homer in the home.

The evidence indicates that Homer was suffering from high blood pressure and a gallbladder condition in 1960 for which he was treated at the Russellville clinic in 1960 and which casued his death in April 1961. He was primarily bedridden throughout 1960; he could not bathe himself and his meals had to be served to him in bed. He required and received constant nursing attention, which we believe was attributable in part to his poor health and probably in part to his age. It is true, as respondent points out, that very few of the charges to Homer's account were for drugs and it can be argued that this indicates his physical condition was not serious or critical. Nevertheless he was given drugs from time to time and he did have a doctor's care during the year. Had age alone made it necessary for Homer to leave the farm when Amizona left, it would have been less expensive for him to live with petitioners or other members of his family. Under such circumstances it is doubtful that the Alabama Department of Pensions and Security would have been willing to make payments directly to the home for Homer's support unless his condition warranted it.

We conclude that Homer's physical condition in 1960 was such as to require constant nursing attention, that a principal reason for his presence at the nursing home was to receive nursing services and attention, and that the costs of his meals and lodging were a necessary incident to such medical care, which was required throughout 1960.

Paragraph (e)(1)(ii) of section 1.213–1 of the regulations provides that payments for nursing services are payments for medical care; and the example in subdivision (v)(b) heretofore mentioned

---

[6] The charge for the medical services and the food and lodging was a flat amount per month, not broken down into separate charges for the various components.

implies that had the individual been in the home for the aged because he required medical or nursing attention, rather than for personal or family considerations, the cost of his meals and lodging at the home would have been considered a cost of medical care. We believe the entire cost of maintaining Homer at the nursing home in 1960 qualifies as a medical expense under section 1.213-1(e)(1) of the regulations. We cannot say that this section of the regulations is an incorrect interpretation of section 213 of the Code. *Martin J. Lichterman, supra* at 596. Hence, petitioners are entitled to deduct the entire amounts paid by them in 1960 for maintaining Homer at the nursing home as a medical expense.

*Decision will be entered under Rule 50.*