ESTATE OF HELEN W. SMITH, C/O WILLIAM D. SMITH, PERSONAL REPRESENTATIVE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 14747–80.　　Filed August 16, 1982.

*John W. Flynn,* for the petitioner.
*Larry N. Johnson,* for the respondent.

DRENNEN, *Judge*: Respondent determined a deficiency in petitioner's 1976 Federal income tax in the amount of $9,070.76. The only issue is whether certain payments made by Helen W. Smith on behalf of her parents were for medical care, thereby entitling her to a deduction under section 213.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by reference.

Helen W. Smith (hereinafter referred to as Helen) died on May 6, 1979. The executor of her estate, William D. Smith, resided in Seattle, Wash., at the time of filing the petition herein. Helen filed an individual income tax return for the taxable year 1976 with the Internal Revenue Service, Ogden, Utah.

Helen's parents, Osborn and Inga Ayres, were both retired and lived near Bellingham, Wash., prior to 1971. In 1971, they moved into a house owned by Helen in Seattle and lived there

---

[1]All section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable year 1976.

until late 1976. Both were her "dependents" throughout 1976. Osborn and Inga moved into Helen's house in Seattle[2] because, due to the deterioration of Osborn's health as a result of emphysema, they wanted to be closer to doctors who previously had treated him. Helen told her parents that they were welcome to stay there as long as they wished.

Due to his emphysema and to recurring bouts of pneumonia, Osborn's health continued to decline after he moved to Seattle. In September 1975, he had a prostate operation which caused him to become confused and disoriented. Osborn never fully recovered from this operation. Thereafter, because he would often wander away and needed constant supervision, Inga found it increasingly difficult to care for Osborn alone.

During 1976, Helen and Inga decided that it would be in Osborn's best interest for Osborn and Inga to move to a place which would provide him with better supervision and easy access to the "nursing-type care" which Helen and Inga believed Osborn would eventually require. They did not seek the advice of a physician when making this decision.

After an extensive search for the best place possible, Helen and her parents settled on a facility known as Panorama City. Panorama City is owned by Panorama Corp. (hereinafter the corporation), and is located on 120 acres in Lacey, Wash. It includes a residential retirement community, a convalescent and rehabilitation center, a restaurant, and some commercial buildings leased to doctors and dentists. The residential retirement community (hereinafter the retirement community) consists of 757 single and multiple occupancy homes and apartments. In addition, there is a community center in which there are hobby and carpenter shops and various administrative offices.

The convalescent and rehabilitation center (hereinafter the convalescent center) is located a few hundred yards from the retirement community. It is essentially a nursing home with a full-time nursing staff providing care for "custodial" type patients who cannot care for themselves. The convalescent center does not employ physicians to attend to its patients.

The retirement community and the convalescent center

[2]The house had six rooms and was located in the "Magnolia District," one of the nicest areas in Seattle.

were separate and distinct facilities. In addition, the corporation kept them separate for accounting purposes. Each facility was separately licensed to operate, and there was a separate admissions process for each, as required by State law. The employees of the convalescent center provided no services for residents of the retirement community, although there was a "nurse call system" in case of emergency. Residents of the retirement community were not guaranteed admission to the convalescent center if the need arose, although they were given priority for such admission over nonresidents.[3]

It was understood by residents of the retirement community that if they became patients of the convalescent center and subsequently were unable to pay for the care received there, they still would be allowed to remain in the convalescent center. Panorama City had a benevolent fund to which contributions were made from various sources. The purpose of this fund was to pay for the care of residents in the convalescent center when they were financially unable to do so themselves.

Prospective residents of the retirement community were required to submit medical records to a medical review committee prior to being admitted. Unless it was determined that the applicant was ambulatory and could take care of himself (i.e., provide his own cooking, washing, shopping, etc.), residency was denied.[4] If two persons were to reside in the same apartment, residency would be approved even though one was unable to care for himself as long as the other was capable of caring for them both. By contrast, admission to the convalescent center was denied unless the individual was unable to care for himself.

No direct medical services were provided to residents in the retirement community. However, there was a personal service staff that made sure the residents were not having problems on the grounds, that they were eating properly, and that

[3]Although most of the patients of the convalescent center were residents in the retirement community, it was not required that they be residents.

[4]If subsequent to becoming a resident in the retirement community the resident became unable to care for himself, he was transferred to the convalescent center.

provided them with transportation to their respective physicians.[5] Also, the building and grounds maintenance employees were instructed to watch for disoriented residents who might be wandering about.

On August 11, 1976, Osborn and Inga applied for residency in the retirement community of Panorama City. At that time, Helen paid a $500 application fee to the corporation on their behalf. The application fee was a good-faith deposit which guaranteed that the apartment selected would be available to the applicant for up to 6 months. Thereafter, Osborn and Inga were approved for residency, and on September 26, 1976, they moved into an apartment in the retirement community.

On or about the time they moved into the retirement community, Osborn and Inga entered into a residency agreement with the corporation for the lease of their apartment. The term of the lease was for the lifetime of either Osborn or Inga, whoever lived longer.

In return for the lease of the apartment, and for service to be provided by the corporation during the term of that lease, described *infra*, Osborn and Inga agreed to pay a one-time entrance fee of $20,460 and a monthly charge of $280. The entrance fee was paid by Helen on behalf of her parents in 1976.

The entrance fee represented a prepayment of a portion of the future monthly charges for the apartment leased to Osborn and Inga. Pursuant to the residency agreement, the corporation agreed to use the fee "solely for and in connection with its purpose of providing, maintaining and operating Panorama City, and providing care for the residents thereof." The amount of the fee charged was determined by projecting what the costs would be for leasing the apartment and for providing the services required under the residency agreement over the lifetime of the residents, based on historical costs, the life expectancy of the residents, and the particular apartment leased. The monthly charge was to cover the remaining portion of the costs projected to be incurred over the resident's lifetime.

Pursuant to the terms of the residency agreement, the

---

[5]The corporation did employ one physician who was responsible for screening the applicants for residency in the retirement community.

corporation agreed to provide Osborn and Inga with the following services:

medical insurance, carpets, laundry facilities, major kitchen appliances for kitchen units, water and sewer, electricity, heat, garbage service, repair of all facilities, general yard maintenance, telecable, basic telephone service (except long distance charges), insurance on Leased Premises, except on the person or personal belongings of Resident. * * *

\* \* \* \* \* \* \*

In case of chronic, prolonged or continuous illness, Resident may, at his option, subject to availability of accommodations, move to the Convalescent and Rehabilitation Center. In all cases, Convalescent Center care must be on the recommendation of a licensed medical or osteopathic physician. Resident shall be entitled to 30 days' standard care in such Center (room, board, normal nursing service), after 30 days' residency, plus 10 additional days of such care following each full year of continuous residency, commencing with the end of the second year of residency pursuant to this Residency Agreement.

The free days of "standard care" were cummulative. If the stay in the convalescent center exceeded the allotted free days, the resident was required to start paying for such care. Any medical care required in addition to the "standard care" was paid for by the resident. Based on historical costs, approximately 7 percent of the entrance fee was estimated to be the cost for providing the cummulative days of prepaid standard care in the convalescent center to residents of the retirement center who entered into residency agreements during 1976.

At the time Osborn and Inga moved into their apartment in Panorama City, Inga was in good physical condition, and continued to be in good condition throughout the taxable year 1976. Although Osborn was not in good health, he was ambulatory, and Inga was able to take care of him. He did not require continuous care or supervision from nurses or doctors.

On December 20, 1976, Osborn was admitted to St. Peter's Hospital due to bronchial trouble resulting from his emphysema. After leaving the hospital the next day, Osborn was transferred to the convalescent center where he remained through the end of the year. Thereafter, he was in either the hospital or convalescent center until his death on October 7, 1978. He never returned to his apartment.

Helen deducted $20,142 as a medical expense on her return for the taxable year 1976. This deduction was calculated by including, in medical expenses, inter alia, the $500 application

fee and the $20,460 entrance fee paid to the corporation on behalf of Osborn and Inga. Respondent denied $19,992 of the claimed deductions.[6]

## OPINION

The only issue is whether Helen is entitled to deduct as a medical expense the application fee and entrance fee paid to the corporation on behalf of her dependent parents.

Petitioner's sole argument is that the principal reason prompting her parents' move to Panorama City was the availability of medical care. Specifically, petitioner asserts that but for the poor health of Osborn her parents would not have moved into Panorama City.

Respondent contends that the expenses herein are not deductible as medical expenses for four reasons: first, the application fee and entrance fee were paid for lodging rather than medical care; second, the amounts paid for lodging are not deductible because the retirement community is not an institution within the meaning of section 1.213–1(e)(1)(v), Income Tax Regs.; third, even if the retirement community is the type of institution contemplated by the regulations, the principal reason that Osborn and Inga moved there was not the availability of medical care; and, fourth, the expenses for lodging were not incurred while Osborn or Inga required continual medical care.

Expenses incurred for the medical care of a taxpayer, his spouse, or his dependents are deductible pursuant to section 213(a).[7] The term "medical care" includes, inter alia, amounts

---

[6]The deduction claimed on the return was calculated by deducting from the total medical expenses an amount equal to 3 percent of adjusted gross income.

Respondent determined that only so much of the fees paid to the corporation as was allocable to medical insurance it provided for Osborn and Inga in 1976 pursuant to the residency agreement, in this case $331.20, was properly deductible, limited to the $150 ceiling provided in sec. 213(a)(2).

[7]SEC. 213. MEDICAL, DENTAL, ETC., EXPENSES.

(a) ALLOWANCE OF DEDUCTION.—There shall be allowed as a deduction the following amounts, not compensated for by insurance or otherwise—

(1) the amount by which the amount of the expenses paid during the taxable year (reduced by any amount deductible under paragraph (2)) for medical care of the taxpayer, his spouse, and dependents (as defined in section 152) exceeds 3 percent of the adjusted gross income, and

(2) an amount (not in excess of $150) equal to one-half of the expenses paid during the

paid for "the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body," as well as for insurance covering such care. See sec. 213(e)(1). In addition, section 1.213–1(e)(1)(v), Income Tax Regs., provides in part as follows:

(v) The cost of in-patient hospital care (including the cost of meals and lodging therein) is an expenditure for medical care. The extent to which expenses for care in an institution other than a hospital shall constitute medical care is primarily a question of fact which depends upon the condition of the individual and the nature of the services he receives (rather than the nature of the institution). A private establishment which is regularly engaged in providing the types of care or services outlined in this subdivision shall be considered an institution for purposes of the rules provided herein. In general, the following rules will be applied:

(a) Where an individual is in an institution because his condition is such that the availability of medical care (as defined in subdivisions (i) and (ii) of this subparagraph) in such institution is a principal reason for his presence there, and meals and lodging are furnished as a necessary incident to such care, the entire cost of medical care and meals and lodging at the institution, which are furnished while the individual requires continual medical care, shall constitute an expense for medical care. * * *

In *Counts v. Commissioner*, 42 T.C. 755 (1964), this Court recognized that costs of maintenance at an institution other than a hospital may constitute expenses for medical care and that whether such costs incurred at an institution are deductible as medical expenses is a factual question the answer to which depends "not on the nature of the institution but upon the condition of the person and the care he receives." We also said that if a principal reason for the person's presence at an institution is the availability of medical care for him, then the costs of meals and lodgings, furnished as a necessary incident to such care, are deductible. See also *Robinson v. Commissioner*, 51 T.C. 520, 539 (1968).

In the instant case, we are concerned primarily with expenses incurred for lodging at a private establishment, namely, the retirement community of Panorama City. At the outset, we note that the retirement community and the convalescent center must be considered separate establishments for purposes of our determination. In addition to being

taxable year for insurance which constitutes medical care for the taxpayer, his spouse, and dependents.

separate and distinct facilities, they were separately licensed to operate by the State, there was a separate admissions process for each, and admission into the retirement community did not guarantee admission into the convalescent center. Further, the employees of the convalescent center generally did not provide services to residents of the retirement community. Also, for the most part, the fees paid to the corporation by petitioner were for the rental of the parents' apartment in the retirement community and for services to be performed during the term of their lease, not for services or care provided in the convalescent center.

The retirement community provided no direct medical services to its residents. Indeed, it required that its residents be ambulatory and able to care for themselves. It did not have a nursing staff and did not employ physicians to provide care for its residents. The only service actually provided to Osborn and Inga which even remotely was connected with the provision of medical care was performed by a personal service staff which ensured that the residents were eating properly and which provided them with transportation to their physicians. Such activity alone does not qualify as medical care, and the retirement community did not regularly engage in providing the type of care or services indicated in section 213(e)(1). *Rose v. Commissioner*, 52 T.C. 521 (1969), affd. per curiam 435 F.2d 149 (5th Cir. 1970). And, indeed, during their residence there, neither Osborn nor Inga received any medical care or nursing services from the retirement community.

Furthermore, the evidence does not show that a principal reason for moving Osborn into the retirement community was the availability of medical care there. Osborn had a rather severe case of emphesyma and was becoming confused and disoriented at times, but he was ambulatory and not in need of constant nursing services. Inga and Helen did not consult a physician about the move. We have no doubt that accessibility to the convalescent center, which could provide the nursing care Inga and decedent anticipated Osborn would need in the future, was a principal reason for such a move, but the location of the institution and availability of medical care in the future are not the criteria for deciding this issue. *Rose v. Commissioner, supra.*

The facts in this case clearly distinguish it from *Counts v.*

*Commissioner, supra,* wherein we held that the expenses of housing the taxpayer's father in a nursing home were deductible as medical expenses. In *Counts,* the taxpayer's father was suffering from high blood pressure and a gallbladder condition during the year involved. He was placed in a nursing home where the assistant administrator was a registered nurse and other nursing services were regularly supplied. He was primarily bedridden throughout the year and could not bathe himself, and his meals had to be served to him in bed. He required and received constant nursing attention, and was treated for his gallbladder condition by the nurses. We concluded that the father's physical condition was such as to require constant nursing attention, that a principal reason for his presence at the nursing home was to receive nursing services and attention, and that the costs of his meals and lodgings were a necessary incident to such medical care.

In the instant case, the retirement center did not provide nursing services or any other medical care. Osborn was ambulatory and could take care of himself for the most part, and he did not receive any nursing services or other medical care from the retirement community. The facts in this case are similar to those in *Robinson v. Commissioner, supra,* wherein we held that the expenses of maintaining taxpayer's mother and father in a home for the aged were not deductible as medical expenses.[8]

Based on all of the foregoing, and the record as a whole, we hold that to the extent the application fee and the entrance fee were for lodging and other services provided to residents of the retirement community, they are not deductible.

A portion of the entrance fee (7 percent) which the corporation required to be paid at the time Osborn and Inga moved into Panorama City was determined by the corporation to be the cost of providing them with free days of standard care in the convalescent center for their lifetimes. We find that the convalescent center was a private establishment regularly engaged in providing medical care and that persons admitted to the center were provided with the medical care referred to in section 213(e)(1). Respondent claims that if this portion of

---

[8]See also *Ball v. Commissioner,* T.C. Memo. 1968–384; *Matles v. Commissioner,* T.C. Memo. 1964–248.

the entrance fee constitutes the payment for medical care, it is for medical care to be received, if ever, in subsequent years, and is not an expense "incurred" in the taxable year 1976 and is therefore not deductible. We disagree.

The intent of section 213 is to allow a deduction for expenses incurred and paid in a taxable year. *Bassett v. Commissioner*, 26 T.C. 619 (1956). The obligation to pay this fee was incurred at the time the residency agreement was entered into, in return for the corporation's promise to provide Osborn and Inga with lifetime lodging and various services, including the free days of standard care in the convalescent center. It cannot be said, as respondent asserts, that no legal obligation to pay such amount existed simply because most of the services promised with respect to such payment would not be received until future years. Cf. *Rose v. Commissioner, supra*; *Bassett v. Commissioner, supra*. Accordingly, 7 percent of the entrance fee, or $1,432.20,[9] paid by petitioner, which is the portion of such fee which is properly allocable to medical care,[10] is deductible as an expense for medical care in the year such expense was incurred and paid, 1976.[11]

*Decision will be entered under Rule 155.*

---

[9]7% × $20,460 = $1,432.20.

[10]Respondent has not challenged the percentage of the entrance fee estimated to be incurred for standard care at the convalescent center. Moreover, we find such estimate to be reasonable under the circumstances herein.

