JOHN ROBINSON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4172–66.    Filed December 31, 1968.

*Willard D. Horwich*, for the petitioner.
*Allan D. Teplinsky*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's income taxes and additions to taxes under section 6653(a), I.R.C. 1954,[1] for the calendar year 1961 in the amounts of $5,486.71 and $274.34, respectively; for the calendar year 1962 in the amounts of $7,190.95 and $359.55, respectively; and for the calendar year 1963 in the amounts of $5,256.82 and $262.84, respectively.

The issues for decision are:

(1) Whether petitioner is entitled to deductions for the years 1961 and 1962 for travel and entertainment expenses of amounts in excess of the amounts allowed by respondent.

(2) Whether respondent properly disallowed for the calendar year 1963 all of the amount claimed by petitioner as a deduction for travel and entertainment expenses because of petitioner's failure to comply with the provisions of section 274(d) and respondent's regulations issued pursuant thereto.

(3) Whether petitioner is entitled to compute his income taxes for the calendar years 1961, 1962, and 1963 as the head of a household.

(4) Whether amounts paid by petitioner to the operators of a rest home and a home for the aged on behalf of his mother and father for the year 1961 and to the operator of a home for the aged on behalf of his father for the years 1962 and 1963 are deductible by petitioner as medical expenses.

(5) Whether respondent properly determined that petitioner is liable for additions to taxes under section 6653(a) for the calendar years 1961, 1962, and 1963 because of negligence or intentional disregard of rules and regulations by petitioner in failing to keep proper records of his income and expenses for each of those years.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner is an unmarried individual who at the time the petition in this case was filed resided in Los Angeles, Calif. He filed individual Federal income tax returns for the calendar years 1961, 1962, and 1963 with the district director of internal revenue at Los Angeles,

---

[1] All references are to the Internal Revenue Code of 1954.

Calif., computing his taxes for the years 1961 and 1962 on the basis of being head of a household, and for the year 1963 on the basis of being a single individual not head of a household.

During the years here in issue and for a number of years prior thereto and continuing to the date of the trial of this case petitioner was a theatrical agent. During the years here in issue petitioner maintained an office in Los Angeles, Calif. He had three full-time employees during these years and he worked full time in his business during these years without taking any vacations. Petitioner's business consisted of booking talent for appearances throughout the United States and sometimes in other countries.

During the years here in issue petitioner maintained a booking sheet for each of the various performers with whom he had a contract providing that he would represent such performer as booking agent. These booking sheets would show the name of the performer and the place where the performer had an engagement and the number of weeks of the engagement. These booking sheets also carried a notation of the commissions received by petitioner from the booking.

During the years here in issue and until the present time, petitioner was required by the Talent and Musicians Union to contract with all of his artists, guaranteeing each artist with whom he had a contract employment for 40 weeks a year. The contracts which petitioner had with the various artists during the years here in issue were for a period of from 1 to 5 years and each of these contracts provided that petitioner was to receive 10 percent of the artist's salary as his commission.

During the years here in issue petitioner did not have, and does not now have, any of the nationally known performers who are sometimes referred to as "headliners" under contract. The artists for whom petitioner acts as booking agent are primarily of the type who perform in small cocktail lounges. In order to operate his business successfully, it is necessary for petitioner to be continuously locating artists to place under contract with him and finding places to market the talent which is under contract with him. Petitioner contacts artists and persons who use the services of such artists both by telephone and by personal contacts in and outside the Los Angeles area.

During each of the years here in issue petitioner kept a diary. The diary was not complete and for certain days contained no notation of any type. The only notations contained in petitioner's diary for the days for which notations were made were the names of the cities outside Los Angeles to which he went and the names of the clubs, cocktail lounges, and restaurants within or without the Los Angeles area which he visited, and sometimes the name of an individual.

When petitioner was in Los Angeles, he would usually go to his office around 10 o'clock in the morning, read his mail, dictate letters, do paperwork, and carry on telephone conversations with performers and other persons. When in the Los Angeles area, petitioner would generally go out approximately four evenings a week to cocktail lounges or nightclubs that had floor shows, generally going to several such places in one evening. While at these clubs petitioner would observe the performers. He would attempt to get the performers which he felt would be beneficial to his business under contract with him. He would also attempt to determine what type of talent might be appropriate to the club so as to be in a position to "sell" his "talent" to the club. Petitioner would also visit with the manager or other buyer of talent for the club and would at times buy drinks for the talent or the manager.

Petitioner traveled outside the Los Angeles area, primarily in Nevada and Oregon, to visit cocktail lounges and similar establishments that employ artistic talent in an effort to procure talent and sell the services of his talent to the various clubs. One of petitioner's employees also traveled outside the Los Angeles area in an effort to procure talent for petitioner and to "sell" talent for petitioner. When petitioner was visiting a town which he had not previously visited, he would generally get a taxicab driver to take him to the various cocktail lounges or clubs which featured entertainment or orchestras. Petitioner would go into the club and introduce himself to the owner, manager, or buyer of talent, talk with such person if possible, observe the layout of the club, and attempt to determine the type of talent the club was in the market for. If petitioner felt that he had talent which might be booked at the particular club, he would try to convince the manager or buyer that he had artists under contract who were the type needed in the particular establishment. Likewise, if petitioner saw talent performing in some particular club which he felt was salable to the various buyers with whom he had contacts, he would introduce himself to these artists and if feasible buy a drink or dinner for them and attempt to convince them that he could well serve them as a booking agent.

During the years here in issue and for many years prior thereto petitioner was considered by the various artists of the type he had under contract and the club managers to whom he sold talent as a lavish spender and tipper, and it was the opinion of these artists and club managers that petitioner spent more in the various clubs than many other talent agents. Petitioner would at times tip the headwaiter in one of the establishments he was visiting $10 or more in order to get a good table and at times when he was in a club would buy drinks for the entire band, all the entertainers, and sometimes everyone in the bar. Sometimes petitioner would go to a club and contact the manager

and be told by the manager that the club was booked for 2 years. However, he would, on numerous occasions, still remain at the club and spend money in the club in the hope of becoming a friend of the club owner or manager and developing a market for talent in the future. Petitioner had many close personal friends among the buyers with whom he did business and also had personal friends among the artists he represented.

During the years here in issue petitioner on frequent occasions advanced or lent money to the artists who were under contract to him, either at a time when they were unemployed or to pay transportation costs to places where he had been able to book them. Petitioner viewed the payments he made for tickets for the artists and the advances he made to artists to be in the nature of loans which he hoped would be repaid to him.

In an effort to ingratiate himself with the people with whom he did business or wanted to do business, petitioner would make gifts of various items or send flowers to such persons, particularly for some special occasion.

During the years here in issue the employees in petitioner's office would type many of the checks drawn by petitioner and all the canceled checks which petitioner had which were typewritten were checks which were prepared by someone in petitioner's office. The handwritten checks were checks which petitioner himself prepared. Either at the time the check was prepared or after the canceled check had been returned, petitioner would in many instances enter a notation on the check such as "gift" or "ent." and instruct the employees in his office to enter the amount on his books under the proper designation such as "gift" or "entertainment." Petitioner kept all his canceled checks and kept books of account in which his income and the expenses as designated by his notations on his canceled checks were entered.

During all of the years here in issue petitioner was a one-half owner of a house located in Hollywood, Calif. Even though he was only one-half owner, he made all the payments on the house for taxes and mortgages and paid all of the expenses in connection with the upkeep of the house. The coowner of the house did not occupy the premises, but the premises were occupied solely by petitioner and persons invited to the house by petitioner. The house has two bedrooms, a front room, and a kitchen. It is furnished with velvet paintings, Tahitian paintings, tropical plants, a waterfall, and other exotic type furnishing which, in petitioner's opinion, would impress buyers and lead them to believe he was a successful theatrical agent. It is customary for a theatrical agent to entertain and petitioner attempted to establish a reputation as one of the more lavish spenders in the group of theatrical agents. Petitioner frequently has parties at his house and various artists live

at his house from time to time when they are in the Los Angeles area. Occasionally out-of-town buyers would live at petitioner's house when they were in the Los Angeles area.

During the year 1961 petitioner was in Los Angeles for 40½ weeks and was out of town for 11½ weeks. During this year petitioner drew numerous checks, the payees of which were various clubs or cocktail lounges located outside of the Los Angeles metropolitan area. Many of these checks were in round amounts of $100 or $200, and two of such checks drawn to Harrah's were in the amounts of $300 and $400, respectively. Some of the checks were drawn in odd amounts such as $56.45, $53.23, $19.05, $52.73, and $10.80. The checks to various out-of-town clubs and restaurants, drawn in odd amounts which total $750.33 for the calendar year 1961, were generally payments made for a specific item purchased or bill incurred by petitioner at a particular club. Checks in even amounts, which checks cashed at out-of-town clubs in 1961 total $4,900, were generally checks for which petitioner received cash. During the year 1961 petitioner also drew checks to various clubs and cocktail lounges in the Los Angeles area. The checks drawn in even amounts to these clubs were checks for which petitioner received cash and the ones in odd amounts were generally for payment of a bill at the club. During the year 1961 petitioner drew checks at Harris Restaurant in even amounts totaling $250 and at other nightclubs totaling $250, and he drew checks to various nightclubs and cocktail lounges in odd amounts totaling $253.61. Portions of the funds received in cash by petitioner for checks drawn to the various nightclubs were spent by petitioner for food and drinks at the various cocktail lounges or nightclubs and for entertaining artists or buyers in those nightclubs.

During the year 1962 petitioner likewise drew numerous checks to nightclubs and cocktail lounges in the Los Angeles area and outside the Los Angeles area. During the year 1962 petitioner spent 41 weeks in the Los Angeles area and 11 weeks outside the Los Angeles area. Likewise in 1962, the checks drawn in even amounts of $50 to $300 at out-of-town or Los Angeles nightclubs or cocktail lounges were for cash which petitioner received from the club and the checks in odd amounts were for purchases made or bills incurred at the club. During the year 1962 petitioner drew checks in even amounts at various cocktail lounges or nightclubs in the Los Angeles area or negotiated checks drawn to cash at such cocktail lounges or clubs during that year in the total amount of $1,050, and drew checks to such nightclubs or cocktail lounges in the Los Angeles area or to American Express for bills incurred in such clubs or cocktail lounges in the total amount of $434.11. During the year 1962 petitioner drew checks

in even amounts at bars, cocktail lounges, nightclubs, or restaurants outside of the Los Angeles metropolitan area in the total amount of $4,010, and drew checks to such establishments for purchases made or bills incurred at the establishments in varying odd amounts in the total amount of $792.61.

During the year 1963 petitioner drew checks in even amounts to various nightclubs, cocktail lounges, bars, or restaurants in the Los Angeles area or drew checks to cash negotiated through such establishments in the total amount of $735, and drew checks to these various types of establishments or to American Express in odd amounts for purchases at or bills incurred at these places in the total amount of $283.23. During the year 1963 petitioner was in the Los Angeles area 46 weeks of the year and was outside of the metropolitan Los Angeles area for 6 weeks of the year. He drew checks to various nightclubs and restaurants outside of the Metropolitan Los Angeles area in even amounts, generally of $200, during the year 1963 in the total amount of $2,225, and drew checks to such establishments in odd amounts for bills incurred in such establishments in the total amount of $525.41. These checks drawn in odd amounts were for more than $25, except for three checks, one drawn June 25 to Stardust Lodge for $20.85, one on October 22 to the Point Loma Inn for $14, and one drawn November 5 to the Green Tree Inn for $8.

During the years here in issue petitioner maintained checking accounts at the Security First National Bank and the Bank of America. Petitioner during these years drew checks for both business expenses and for personal funds on each of these two bank accounts. During all of the years here in issue he also drew checks to cash and cashed numerous counterchecks at the Security First National Bank. The total cash drawn in this manner by petitioner was at least $6,385 in 1961, $3,950 in 1962, and $5,125 in 1963. Some of the cash received by petitioner from the bank on these checks cashed by him during the years here in issue was spent for entertaining various buyers or artists and some was spent for personal uses of petitioner. Most checks drawn for petitioner's personal needs were drawn on the Security First National Bank although at times checks relating to petitioner's personal affairs were drawn on his account at the Bank of America.

During the years here in issue petitioner purchased a number of depreciable assets for his house such as a television set, polar bear rug, circular bed, paintings, carpeting, fences, landscaping, and similar items. Petitioner also during these years purchased food and liquor which were consumed in his home. During the year 1961 petitioner spent $981.79 for liquor which was used in his home, during the year 1962 he spent $1,841.78 for liquor used in his home, and during the

year 1963 he spent $1,255.49 for liquor used in his home. During the years 1961, 1962, and 1963, petitioner incurred expenses for maintenance and upkeep of his home including maid services, yardman, painting, and the like in the total amounts of $226.36, $390.85, and $1,020.88, respectively. During the years 1961, 1962, and 1963 petitioner paid $274.25, $374, and $454.58 to a regular housekeeper and a person who did odd jobs around his house. During the years 1961, 1962, and 1963, petitioner spent $246.59, $260.45, and $221.53 for utilities for his house. The original cost of petitioner's house when it was purchased prior to the years here in issue was $30,000, and petitioner on his income tax returns allocated $4,000 of this price to the lot and the balance to the improvements.

During the years here in issue petitioner made numerous purchases of flowers, glassware, clothing, and other items which he gave to various artists or buyers, members of their families, or other persons as gifts. The total cost of such purchases made by petitioner during the year 1961 was $1,247.59. The total cost of such purchases made by petitioner during the year 1962 was $688.58. In 1962 petitioner, in addition, bought gifts around Christmastime out of cash he received from a $200 check drawn on December 18. The total amount of such purchases made by petitioner during the year 1963 was $650.75. Of this amount petitioner had receipts from several shops showing the item with a notation as to whom the item was given. One of these was from the "Cherry Blossom" in Honolulu, Hawaii, for a shirt which cost $7.50 which he had mailed at a postage cost of 88 cents to Dick Raymond, the owner of Raymond's Friendly Lounge in Butte, Mont. There were also two receipts from Lee Drugs, one dated December 19, 1963, in the total amount of $79.10 for five bottles of perfume and gift wrappings with the notation "Xmas present to girl leaders" and the other dated December 23, 1963, in the amount of $91.74 for three bottles of perfume and one box of candy which had the notation "Xmas presents to leaders." The eight bottles of perfume and the box of candy were Christmas presents which petitioner gave to the various leaders of "girl bands" with whom he had contracts. There were several receipts for flowers purchased by petitioner, one of which was for a wreath for himself, and one for a flower for Alice Bowen, the woman who ran the home where his father lived. One of these receipts was for a flower arrangement sent to a person who did taxwork for petitioner, and petitioner showed no business reason for sending this flower arrangement. The two remaining receipts for flowers were for $15.60 for a spray sent by petitioner on February 18, 1963, to the funeral of an artist who was the leader of one of the western bands which petitioner was then booking and for $16.74 for flowers sent on December 11, 1963, to an

employee of petitioner who had previously been part of a "sister" act booked by petitioner and had been also at one time a "buyer" of talent from petitioner. There were other receipts from Lee Drugs which contained the notation "gifts" but no indication of the person or persons to whom the items were given. Except as above set forth, no notations were made on the checks drawn by petitioner to the various flower shops, gift shops, and stores for the items he purchased for gifts as to the person to whom the gift was to be made. In addition to the checks drawn to the various stores and florists for items which petitioner used as gifts, petitioner drew a number of checks to some of these same shops for items purchased for himself. Some of the flowers sent and other gifts purchased by petitioner were for gifts to personal friends.

During the years here in issue petitioner drew a number of checks to various airlines and car rental companies and in many instances had the receipts from the airlines showing the item for which the check was issued. Some of the checks issued to airlines were for advances of travel funds to various artists who were under contract with petitioner. During 1961 petitioner drew such checks in the total amount of $2,035.98, of which amount $1,357.29 was for transportation for artists under contract to petitioner. In 1962 petitioner drew such checks in the total amount of $389.52, of which amount $155.76 was for transportation of an artist under contract to petitioner. In 1963 petitioner drew such checks in a total amount of $505.09, of which amount $437.51 was for transportation of artists under contract to petitioner.

The following list for the year 1963 shows amounts expended by petitioner at hotels when he was out of town on business for which petitioner has the hotel bill which shows the date of the various charges and the specific nature of the charges which were all proper business travel expenses:

| Date 1963 | Hotel | Amount | Date 1963 | Hotel | Amount |
|---|---|---|---|---|---|
| Jan. 19–20 | Jack Tar, San Francisco, Calif. | $32. 35 | May 7 | Hotel Nevada, Ely, Nev. | $18. 89 |
| | | | May 8–10 | Showboat Hotel, Las Vegas, Nev. | 32. 51 |
| Jan. 30–Feb. 3. | Hotel Fremont, Las Vegas, Nev. | 60. 31 | | | |
| Apr. 26–27 | Harvey's, Lake Tahoe, Nev. | 42. 85 | Oct. 22–23 | Catamaran, San Diego, Calif. | 25. 23 |
| Apr. 28–May 2. | Holiday, Reno, Nev. | 57. 38 | Nov. 5–9 | Hotel Fremont, Las Vegas, Nev. | 54. 53 |
| May 3–6 | Commercial Hotel, Elko, Nev. | 27. 94 | | | |
| | | | | Total | 351. 99 |

Petitioner also paid $6.30 to the Hotel Nevada, Reno, Nev., for a room on May 7, 1963, for one of his women artists whom he was bringing back from Nevada to Los Angeles for her to rejoin the Abbia Neal band.

During the year 1962 the carpeting in the front bedroom of petitioner's home was damaged when a windstorm blew a portion of the roof of his house off, and in 1963 petitioner had a television set stolen from his home. Petitioner was reimbursed for both of these losses by insurance. The expenditures in the amount of $910.31 in 1962 and $179 in 1963, checks for which were included in the checks petitioner identified as relating to his home expenses, were to replace the carpeting and the television set.

Prior to 1961 petitioner maintained an apartment for his parents in San Bernardino, Calif. His parents were retired, and neither of them had taxable income in excess of $600 in 1961 or for several years prior thereto. In 1961 petitioner's mother was 87 or 88 years old, and his father, nearly 90 years. His mother would have mental lapses and at times would be quite confused. She had suffered several falls and her mental state, as well as the physical infirmities of her advanced age, rendered her unable to care for herself. Petitioner's father was in reasonably good health but was blind in one eye and had poor vision from the other eye.

In the latter part of 1960 when petitioner would visit his mother and father in their apartment in San Bernardino, he would notice that the apartment was ill-kept and at times even dirty. Petitioner concluded that his father was unable to care for his mother and the apartment and therefore decided to move his parents from the apartment in San Bernardino to a rest home in Los Angeles operated by Ada Johnson, hereinafter referred to as Johnson's Rest Home. In January of 1961 petitioner's parents moved with all their personal belongings into Johnson's Rest Home. They left San Bernardino permanently. The facilities furnished to petitioner's parents in Johnson's Rest Home consisted of a separate room with twin beds and a closet for their clothing. The room had a washbasin and a toilet but no cooking facilities. Johnson's Rest Home did not have a doctor in attendance but petitioner's parents did have their own doctor. Petitioner paid Ada Johnson $350 a month for room and board for his parents at Johnson's Rest Home. There were other persons besides petitioner's parents living at Johnson's Rest Home.

In late July or early August 1961 petitioner's mother was taken from Johnson's Rest Home to Braewood Sanitarium and remained at Braewood Sanitarium until her death in October 1961. During the months of July, August, September, and October 1961, while petitioner's mother was in the sanitarium and following her death, petitioner's father lived in the room at Johnson's Rest Home alone and petitioner paid Ada Johnson $200 per month for each of these months for his room and board. Petitioner also paid sums to the Braewood

Sanitarium for the care of his mother which sums are not in issue here, having been allowed to petitioner as medical expenses by respondent. During the year 1961 petitioner also paid $60 to the doctor who rendered services to his mother and father.

In the latter part of 1961 Ada Johnson was preparing to sell the property where she operated her rest home and move the rest home to another location. For this reason petitioner's father moved, as of the beginning of November 1961, to a boarding home for the aged operated by Alice M. Bowen, hereinafter referred to as Bowen's Home for the Aged. Petitioner paid Alice M. Bowen for room and board for his father in Bowen's Home for the Aged $200 a month in each of the months November and December 1961.

Petitioner's only relative, besides his mother and father, is a brother who lives in Ohio. During 1961 petitioner's brother, F. P. Robinson, reimbursed petitioner the amount of $1,794.14 for the support of their father and mother.

At Bowen's Home for the Aged petitioner's father shared a room which was approximately 12 feet by 20 feet with another gentleman named Clayson. The room had washing and toilet facilities and twin beds. Petitioner's father and Clayson each had his own easy chair, and they had a television set in their room. During the years 1962 and 1963 Bowen's Home for the Aged was licensed as a home for the aged by the State and county authorities. Under this license no person could be taken into Bowen's Home for the Aged unless he was ambulatory and able to come to his meals. Bowen's Home for the Aged was not in the nature of a sanitarium, and Alice Bowen would not take any persons who were not mentally alert into this home. She would not have taken petitioner's mother in the state she understood petitioner's mother to be in when she went to Johnson's Rest Home. Petitioner's father during the years here in issue was mentally alert and was physically well, except for his impaired vision. During the year 1962 petitioner's father went for a 2½-month visit to the home of petitioner's brother in Ohio. During the year 1962 petitioner paid to Alice Bowen the total sum of $1,960 for room and board and any other services rendered to his father at Bowen's Home for the Aged. During the year 1963 petitioner paid Alice Bowen the sum of $2,400 for room, board, and other services rendered to his father at Bowen's Home for the Aged. There was no doctor or nurse at Bowen's Home for the Aged. A cook was employed and two Japanese students were also employed who rendered necessary attention to the male occupants of Bowen's Home for the Aged. Bowen's Home for the Aged was licensed to have six boarders and to take men and women. Alice Bowen originally started operating the home when she was attempting to find

a boarding home for her mother when her mother became aged. Alice Bowen had previously operated a summer camp for children and had no training in operating a home for the aged. However, from her experience in operating a summer camp she realized the need for the persons living in her home for the aged to keep occupied and attempted to keep all of the persons living there occupied in some way. Since petitioner's father was unable to read because of his poor eyesight, Alice Bowen got him interested in braiding rugs from wool remnants and was praised by her supervisors because of the quality of the rugs which petitioner's father made even with his limited ability to see. Since there was no shower in the quarters occupied by petitioner's father and Clayson, the attendant would help petitioner's father in and out of the bath facilities. Since petitioner's father insisted on shaving with a straight razor, these attendants would also assist him with his shaving. Petitioner's father was able to dress himself, and his roommate who was younger than he by about 6 years would help him to pick out the clothing he would wear. Once when petitioner's father went out for a walk alone, he tripped on the sidewalk and fell and broke a bone in his wrist. After that experience Alice Bowen would see that one of the attendants or another one of the persons living in her home for aged went with petitioner's father when he went out for a walk. It was Alice Bowen's opinion that petitioner's father would not be able to care for himself living alone in such a way as to live "with dignity." He would not have been able to prepare his own food properly and to keep himself with a clean, neat appearance.

Petitioner paid doctor bills for himself of $115 in 1963 and doctor bills for his father of $67.50. Petitioner paid a dentist bill for himself of $45 and paid health insurance premiums for himself of $245.20 in 1963.

Petitioner on his income tax return for 1961 claimed both his mother and his father as his dependents and the claimed dependency exemptions were not disallowed by respondent. He claimed his father as his dependent in 1962 and 1963 and the claimed dependency exemption was not disallowed by respondent. Respondent disallowed $1,755.86 and $2,400 of the medical expenses claimed by petitioner as deductions in the years 1961 and 1962 on the grounds that the amounts did not constitute medical expenses within the provisions of section 213. The amounts so disallowed represented the amounts paid in 1961 for expenses of petitioner's mother and father at Johnson's Rest Home and the $400 expenses of petitioner's father at Bowen's Home for the Aged, and the $2,400 disallowed in 1962 represented a disallowance of an amount explained on petitioner's income tax return as "Sanitarium expenses on dependent father over 65 years."

Petitioner on his income tax returns for the calendar years 1961, 1962, and 1963 claimed deductions for travel and entertainment expenses in the amounts of $14,277.41, $14,943.19, and $10,247.15, respectively. Respondent disallowed $9,168.23 of the claimed deduction for 1961, $9,840 of the claimed deduction for 1962, and the entire claimed deduction for 1963 on the ground that petitioner had not established that the amounts disallowed constituted ordinary or necessary business expenses or were expended for the purpose designated.

Petitioner on his income tax return for 1961 claimed $1,248.81 as a business deduction for household expenses. This amount was arrived at by using a basis of the house for depreciation purposes of $26,000, computing 5-percent depreciation thereon or $1,300, and claiming 50 percent as applicable to petitioner because of the joint ownership of the house, thus arriving at depreciation of $650. To this petitioner added $3,130 for household expenses including gardening, utilities, insurance, maintenance, and repairs, and $1,212 for groceries making total expenses of $4,995.24 of which petitioner charged 25 percent to business resulting in the claimed deduction of $1,248.81. For the year 1962 petitioner claimed business expenses because of his household expenditures of $872.73 which was arrived at by using depreciation of $650, charging 20 percent of carpeting expense of $910.31 and cost of a television set of $179, or $225.73 to such household expenses, and adding thereto expenses for gardening, utilities, insurance, maintenance, and repairs of $1,320 and groceries of $1,305, making a total of $3,490.93 of which 25 percent, or $872.73, was charged as business expenses. For 1963 petitioner claimed the amount of $1,194.51 as business expenses for use of his house which was arrived at by using $650 of depreciation, $225.73 representing 20 percent of new carpeting and a television set, household expenses such as gardening, utilities, insurance, maintenance, and repairs of $2,522.31, and groceries of $1,380, or a total of $4,778.04, of which 25 percent, or the $1,149.51, was charged as business expense.

Respondent in his notice of deficiency disallowed $871.81 of the amount of deductions claimed for household expenditures for the year 1961, $402.96 of the amount claimed for 1962, and the entire amount claimed for 1963, giving as a reason for his disallowance that petitioner had not established that the amounts disallowed constituted ordinary or necessary business expenses or were expended for the purposes designated.

Respondent for the years 1961 and 1962 computed petitioner's income tax on the basis of a single individual and not as head of a household as claimed by petitioner. For the year 1963 petitioner had filed as a single individual and claimed no medical expense deduction for

the amount paid to Alice Bowen for his father's expenses in Bowen's Home for the Aged. However, petitioner in his petition contended that he should have computed his tax for the year 1963 as head of a household and in his amended petition claimed an additional medical expense deduction of $2,400 because of expenses paid to Alice Bowen on behalf of his father.

### ULTIMATE FACTS

1. For the calendar years 1961 and 1962 petitioner incurred travel and entertainment expenses other than amounts expended in connection with his household expenses in the amounts of $8,628.69 and $8,133.76, respectively.

2. For the calendar year 1963 petitioner is entitled to deductions for travel and entertainment expenses including gifts only to the extent that he maintained adequate records for substantiation of such expenditures within the provisions of section 274 and respondent's regulations issued pursuant thereto. The total amount of petitioner's expenditures for travel and entertainment including gifts which petitioner has substantiated as required by section 274 for the year 1963 is $671.90.

3. Petitioner has failed to show that he is entitled to deductions for expenditures in connection with his household for the years 1961 and 1962 in excess of the amounts allowed by respondent or that he is entitled to any such deduction for the year 1963 because of failure to maintain records to substantiate such deductions as required by section 274 and respondent's regulations issued pursuant thereto.

4. Petitioner maintained a household for his parents during the year 1961 and for his father during the years 1962 and 1963 within the meaning of section 1(b) (2) (B).

5. Petitioner is not entitled to include in his medical expense deductions the amount paid to Ada Johnson for room, board, and services for his mother and his father for the year 1961, nor the amounts paid to Alice Bowen for such expenses for his father in her home for the aged for November 1, 1961, throughout the year 1963.

6. Petitioner's books and records were not so inadequate as to cause him to be liable for the addition to tax under section 6653(a) for any of the years here in issue.

### OPINION

As both respondent and petitioner recognize, amounts spent for travel and entertainment are deductible by a taxpayer under section 162 only to the extent that such amounts constitute ordinary and necessary business expenses. In order to be entitled to a deduction for such

expenditures, a taxpayer must show not only that the amounts claimed as a deduction were spent on travel and entertainment, but also, that the travel and entertainment were of a nature so related to the conduct of his business as to be ordinary and necessary business expenses as distinguished from personal expenses. Petitioner in the instant case has introduced substantial evidence as to the total amount of his expenditures by showing amounts of bills paid to various nightclubs, cocktail lounges, and restaurants, and amounts of cash withdrawals from his bank accounts. Since most of petitioner's office expenses and bills, such as utilities, mortgage payments, and store bills, were paid by check, the testimony of petitioner that most of this cash was for travel, entertainment, and personal expenditures is logical. Petitioner contends that all his activities were business and would therefore have us conclude that, except for very minor amounts which he spent for personal needs, all the cash he spent was for business travel and entertainment. We do not agree with petitioner's contention in this respect. The evidence does not show that petitioner's personal expenditures were negligible. The evidence does show that the various managers of nightclubs and buyers of talent as well as many of the artists under contract to petitioner, were his personal friends as well as his business associates. Therefore, some of his entertainment of these persons most likely was personal entertainment. See *Donald G. Teeling*, 42 T.C. 671, 685 (1964). Also, for an expense to be "ordinary and necessary," it must be appropriate and helpful to a taxpayer's business, and in determining whether an expenditure falls within this category, the reasonableness or unreasonableness of the expenditure in relation to its effect upon the taxpayer's business is to be considered. See *Rodgers Dairy Co.*, 14 T.C. 66, 73 (1950). The record here shows that some of the amounts spent by petitioner had little if any business advantage to him, as for example buying a drink for everyone in the bar. We therefore do not agree with petitioner that he has shown that he is entitled to the entire deductions claimed by him for travel and entertainment expenses.

It is respondent's position that although petitioner's records are inadequate to substantiate any substantial portion of the claimed deductions for travel and entertainment expenses, under *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930), for the years 1961 and 1962 the Court is required to estimate the amount of such deductions to which petitioner is entitled from all the evidence weighing heavily against petitioner because of his inadequate records, but that petitioner is only entitled to deduct travel or entertainment expenses for the year 1963 to the extent that such expenses are substantiated by the type of

substantiation required by section 274 [2] and respondent's regulations issued pursuant thereto. Although respondent disallowed the deduction for travel and entertainment expenses claimed by petitioner in their entirety for the year 1963, in his brief he concedes that at the trial petitioner produced the type of substantiation of such expenses required by the statute for the amount of $475.33.

We have set forth in our Findings of Fact substantial details concerning the documentary and other evidence introduced at the trial by petitioner in an effort to substantiate his claimed deductions for travel and entertainment expenses and household and other expenditures. Respondent on the basis of the evidence has conceded that petitioner has produced adequate substantiation of $392.27 for the year 1961 and $782.84 for the year 1962 of the amounts of the travel and entertainment expenses which he disallowed in his notice of deficiency. Since respondent allowed merely an amount in his notice of deficiency and the computation of the amount is not explained in the record, we are unable to tell exactly what items comprise the additional amounts respondent now concedes. However, we are satisfied from the record that petitioner did expend on travel and entertainment expenses for the years 1961 and 1962 amounts substantially in excess of the amounts allowed by respondent and have set forth in our ultimate findings our conclusion as to the amounts of deductions to which petitioner is entitled for the years 1961 and 1962. In coming to this conclusion we have weighed heavily against petitioner because of his inadequate records. We are, however, persuaded by the record that during 1961 and 1962 petitioner expended at least $125 a week during all of the weeks he was in Los Angeles on business entertainment outside his home and for the weeks he was outside of Los Angeles he expended at least $225 a week for his own meals and lodging while away from home on business and for entertainment in connection with his business activities. In coming to this conclusion we have considered the amount of the checks drawn by petitioner in payment of bills to nightclubs as well as the cash expended by petitioner and all the other evidence of record in this case. Although many of the

[2] SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES.
    (d) SUBSTANTIATION REQUIRED.—No deduction shall be allowed—
        (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home),
        (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or
        (3) for any expense for gifts,
unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. * * *

gifts made by petitioner were not ordinary and necessary business expenses in that the gift did not bear a proximate relationship to petitioner's business, we are convinced from the record that petitioner expended at least $300 in each of the years 1961 and 1962 on gifts which were business related. The record shows that transportation costs for petitioner's trips out of town, other than by use of his automobile, totaled $678.69 for 1961 and $233.76 for 1962. Respondent allowed petitioner's claimed deduction for automobile expense and there is no issue with respect to this transportation expense of petitioner. We arrived at the amount of deductions to which we consider petitioner to be entitled as ordinary and necessary travel and entertainment expenses including gift expense during 1961 and 1962 by an addition of the various amounts we have estimated to have been spent by petitioner for these business purposes.

Although much evidence was offered as to expenditures made by petitioner in connection with maintaining his household, there was insufficient evidence to show to what extent these expenditures were for business entertainment as distinguished from personal expenditures of petitioner for his own personal living expenses and in entertaining his friends. Also, some of the items claimed by petitioner to be business expenses were in fact capital expenditures which should be considered as capital items to be depreciated and the two items which petitioner claimed to be depreciable on a 5-year basis were items which constituted replacements with funds received from an insurance company.

We have noted that petitioner was not claiming depreciation on any other household furnishings except to whatever extent such items may have been included in the cost of the house, and there is nothing in the record to indicate that such items were so included. However, there is nothing in the record to indicate that such items may not have been previously deducted or fully depreciated. The record is totally unsatisfactory to establish any deduction for a claimed expenditure in connection with maintaining petitioner's household for 1961 and 1962 in excess of those allowed by respondent. We therefore sustain respondent's disallowance of the portion of petitioner's claimed deduction for household expenses which he determined not to be allowable in each of the years 1961 and 1962.

This Court, in *William F. Sanford*, 50 T.C. 823 (1968), sustained the Commissioner's disallowance for the year 1963 which is the first year to which section 274 of the Code and section 1.274–5(c)(2), Income Tax Regs., are applicable, of any claimed deduction for travel and entertainment expenses for which a taxpayer did not produce substantiation as required by the statute and regulations. In that case we pointed out that the committee reports were clear that the section was enacted to overrule with respect to 1963 and subsequent years the

"so-called Cohan Rule." In accordance with our holding in the *Sanford* case, we sustain respondent's disallowance of petitioner's claimed travel and entertainment (including gifts) expenses and petitioner's claimed household expenses, except to the extent of $671.90 which we have determined under the facts in this case to be substantiated with the necessary documentary evidence as required by section 274 and respondent's regulations. The items which we consider to be substantiated and thus deductible are set forth in our findings. See *William F. Sanford*, *supra*, and *Walter L. Woodward*, 50 T.C. 982 (1968). No useful purpose would be served by a detailed discussion of the reasons for the failure of the records kept by petitioner to meet the requirements of section 274. The records kept by petitioner were approximately the same type records as those kept by the taxpayer in *William F. Sanford*, *supra*. We consider for the reasons stated in the *Sanford* case that petitioner has not complied with the requirements of section 274, except with respect to $671.90 of his claimed deduction for travel and entertainment expenses and has not complied to any extent with respect to his claimed deduction for household expenses. Petitioner contends that if we conclude that he did not keep records which meet the requirements of section 274, since 1963 was the first year to which section 274 was applicable, that section should not be strictly applied to him for that year in accordance with respondent's pronouncements in certain of his rulings. We reject this contention for the same reasons we rejected a similar contention in *William F. Sanford*, *supra*.

Finally, petitioner contends that under the provisions of section 1.274–2(b)(1), Income Tax Regs., "Although attending a theatrical performance would generally be considered entertainment, it would not be so considered in the case of a professional theatre critic attending in his professional capacity," the costs of petitioner's going to nightclubs to inspect talent should not be disallowed because of failure to comply with the provisions of section 274. Petitioner, however, claimed his deduction as travel and entertainment. He has not shown what cost if any he would incur merely to view a show as a critic. Since petitioner claimed the deduction as entertainment and not as the cost of looking over talent and attempted to substantiate the expenditures as entertainment, there is insufficient evidence in the record to determine whether petitioner incurred any costs solely in viewing talent and if so the approximate amount of such costs. We therefore sustain respondent's disallowance of petitioner's claimed deductions for travel, entertainment, and household expenses for the year 1963 except to the extent of $671.90.

Petitioner argues that since his mother and father had permanently given up their apartment in San Bernardino, Calif., when they moved into the Johnson Rest Home, this house was their permanent home

in 1961. He contends that their room in the Johnson Rest Home was the household which he maintained for them.[3] Neither party cites any case specifically dealing with the meaning of the word, "household." Petitioner cites a number of cases dealing with what is the permanent residence of an individual. However, these cases are not in point since respondent does not contest the fact that petitioner's parents had given up their residence in San Bernardino and had permanently moved into the Johnson Rest Home. Petitioner also cites *Florence H. Griffith*, 35 T.C. 882, 893 (1961), which deals not with the question of what is a household but with the question of whether the taxpayer in that case paid more than one-half of the cost of maintaining the household.

While the statute does not in the case of a parent require that the parent share the taxpayer's household, if the word "household" as used in the statute refers to the entire residential unit, as respondent contends based on his Rev. Rul. 57-307, 1957-2 C.B. 12, petitioner has totally failed to show that he paid over one-half the cost of maintaining the "household" in which his mother and father lived in 1961 and his father lived in 1962 and 1963. The evidence does not show that petitioner paid over one-half of the cost of maintaining the Johnson Rest Home in 1961 or Bowen's Home for the Aged in 1962 and 1963. Petitioner's claim is that in 1961 his mother's and father's room was "their household" and that the portion of the room in Bowen's Home for the Aged used by his father in 1962 and 1963 was his father's "household" in those years.

The term "household" has varying definitions.[4] Many of the cases

---

[3] Sec. 1(b)(2), I.R.C. 1954, provides:

(2) DEFINITION OF HEAD OF HOUSEHOLD.—For purposes of this subtitle, an individual shall be considered a head of a household if, and only if, such individual is not married at the close of his taxable year, is not a surviving spouse (as defined in section 2(b)), * * *

\*        \*        \*        \*        \*        \*        \*

(B) maintains a household which constitutes for such taxable year the principal place of abode of the father or mother of the taxpayer, if the taxpayer is entitled to a deduction for the taxable year for such father or mother under section 151.

For purposes of this paragraph and of section 2(b)(1)(B), an individual shall be considered as maintaining a household only if over half of the cost of maintaining the household during the taxable year is furnished by such individual.

[4] Corpus Juris Secundum contains the following statement with respect to "Household as a noun":

"The word is one of well known legal meaning, being the definition of the Latin word 'familia.'[86] It has been variously defined, depending to some extent on the connection in which it is used;[87] and may mean a domestic establishment, a family, a number of persons dwelling under the same roof and composing a family;[88] and, by extension, all who are under one domestic head;[89] a group of persons living together;[90] * * * an organized family and whatever pertains to it as a whole;[92] persons who dwell together as a family.[93] Also the place where one holds house, his home. [Footnotes omitted.]"

Webster's Unabridged Dictionary defines household as follows:

"Household *n.* 1. Householding; housekeeping; also household goods and chattels. Obs. 2. Those who dwell under the same roof and compose a family; a domestic establishment; family."

Black's Law Dictionary (4th ed.) contains the following definition of household:

"Household *n.* A family living together * * * Those who dwell under the same roof and compose a family."

dealing with the definition of "household" are concerned with the provisions in automobile liability insurance policies and stress the concept of the family group under the management of the head of the household. See *Hardesty* v. *State Farm Mutual Automobile Insurance Co.*, 361 F. 2d 176 (C.A. 10, 1966). This concept of "household" renders meaningless the statute with which we are dealing which does not require that the taxpayer's parent live in the taxpayer's household. If "family" is substituted for "household" the statute would read "maintains a *family* which constitutes for such taxable year the principal place of abode of the father or mother of the taxpayer." Since the statute with which we are concerned departs from the concept of "household" as a group living under one roof as a family, some other meaning of the term must have been intended by Congress. In a number of cases this Court and other courts have given a liberal construction to the statute in favor of allowing the status of head of household to a single person who fully supports a child or a parent. See *Walter J. Hein*, 28 T.C. 826 (1957), and *Brehmer* v. *United States*, 191 F. Supp. 421 (D.Minn. 1961). In the instant case if we use the meaning "home" for the word "household" we can agree with petitioner that he did during each of the years here in issue "maintain a *home* which constitutes for such taxable year the principal place of abode" of his father or mother. As does the term "household," the word "home" has many meanings. The permanent residence of a person is often referred to as that person's home. In this meaning of the word "home" petitioner did maintain in 1961 a "home" for his mother and father by paying the major portion of the cost of their room and board in the Johnson Rest Home, and in 1962 and 1963 maintained a "home" for his father by paying the entire cost of his room and board in Bowen's Home for the Aged. Because of the nature of the statute here under consideration and lack of precise meaning for the word "household" used therein, we consider it proper to give the statute the most favorable reasonable construction to support petitioner's right to compute his tax as head of household. We therefore hold that petitioner is entitled to compute his tax as head of household in each of the years here in issue.

The next issue is whether petitioner is entitled to include in his medical expense deduction the amount which he paid to Ada Johnson in 1961 for his mother and father and to Alice Bowen in 1962 for his father. Petitioner contends that it is not the nature of the facility in which a person lives which determines whether payments for that facility are a medical expense but rather the nature of the service rendered to the person living in the facility, citing *W. B. Counts*,

42 T.C. 755 (1964). In that case we held that payments made by the taxpayer to maintain his father in a nursing home were deductible as medical expenses. We pointed out that while the nursing home was not a hospital, it was not merely a home for the aged and that it did have available nursing facilities. We also pointed out in that case that the taxpayer's father was totally unable to care for himself and needed the professional nursing care offered by the registered nurse who was the assistant administrator of the home, as well as the general nursing care he received in the home. In the *Counts* case we stated that whereas *Commissioner* v. *Bilder*, 369 U.S. 499 (1962), had held that living expenses which are incidental to medical treatment or care are not deductible, respondent's regulations continued to recognize the rule allowing deductions of the cost of meals and lodging provided as a part of the in-patient hospital or institutional medical care. We recognized that the cost of maintenance at an institution other than a hospital might constitute medical care and that whether such costs incurred in an institution other than a hospital are deductible as a medical expense is a factual question, "the answer to which depends not upon the nature of the institution but * * * the condition of the person and the care * * * he receives."

There is no evidence in the instant case as to the services rendered to petitioner's mother in Johnson's Rest Home. As far as the record shows she received no medical attention in that home. The evidence shows that petitioner's father did not need professional nursing attention or any other medical attention and received no such services either at Johnson's Rest Home or Bowen's Home for the Aged. Petitioner's father could have lived with petitioner or petitioner's brother or even in an apartment with someone to assist with the housework insofar as this record shows. Petitioner's father during all the years here in issue was in good health and his only infirmity was poor sight. Certainly, his life was happier and he possibly lived with more "dignity" because of living in Johnson's Rest Home and in Bowen's Home for the Aged. However, the general happiness and dignity with which a person lives is not the criteria which we set forth in *W. B. Counts*, *supra*, for determining whether payments for room and board to an institution other than a hospital are deductible medical expenses. Alice Bowen in her testimony stated that in her opinion, petitioner's father could not have cared for himself. However, even her testimony qualified this statement by referring to the general dignity with which he was able to live in Bowen's Home for the Aged as compared to any effort he might have made to live alone. Our discussion in *W. B. Counts*, *supra*, clearly indicates that payments made to maintain a person in

a home for the aged merely because he will be happier living in such an institution would not be sufficient to entitle the person making the payments for a dependent to a deduction for the amount as medical expenses. We listed in detail the medical services rendered by the nursing home staff to the taxpayer's father in the *Counts* case. Here petitioner's father received no medical attention or services at either Johnson's Rest Home or Bowen's Home for the Aged. Clearly from this record, medical services were not a reason and certainly not a principal reason for petitioner's father being in these homes.

The final issue is whether respondent properly determined the addition to tax under section 6653(a).[5] That section provides that if any part of the underpayment is due to negligence or intentional disregard of rules and regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. Respondent calls attention to section 6001 which provides that every person liable for any tax shall keep such records as the Secretary or his delegate may from time to time prescribe and to section 1.6001–1, Income Tax Regs.,[6] which provides that any person subject to the income tax law, "shall keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information." This record shows that petitioner did keep regular books of account listing his income, various office expenses, and other expenses. Insofar as this record shows, the only difficulty with petitioner's records was the fact that he did not have the detailed receipts and diary to support the deductions for travel and entertainment expenses which he claimed. We have sustained in part respondent's disallowance of these claimed deductions for the years 1961 and 1962 because we have weighed heavily against petitioner in determining the amount of deductions to which he is entitled because of his inadequate records to explain all items claimed. We have sustained respondent, except to a minor extent, in his disallowance of the deductions for the year 1963 because

---

[5] SEC. 6653. FAILURE TO PAY TAX.

(a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME OR GIFT TAXES.—If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.

[6] Sec. 1.6001–1 Records.

(a) *In general.* Except as provided in paragraph (b) of. this section, any person subject to tax under subtitle A of the Code, or any person required to file a return of information with respect to income, shall keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information.

of petitioner's failure to comply with the provisions of section 274. However, the records kept by petitioner were kept in substantial detail and petitioner even kept some detailed records, such as canceled checks and certain receipts with respect to his travel and entertainment expenses. The type of records which petitioner failed to keep were the type referred to in section 274 and not the type generally regarded as constituting a taxpayer's permanent books of account. The fact that we do not consider petitioner's records adequate to substantiate all of his claimed travel and entertainment expense deductions in 1961 and 1962 or to comply with the provisions of section 274 for the year 1963 does not require the conclusion that petitioner has been negligent or in intentional disregard for respondent's rules and regulations in the manner in which he maintained his records. Petitioner kept records which were sufficiently accurate to show his income and deductions using his theory that all his expenditures for food, entertainment, liquor, and gifts were deductible business expenses. No items of income were omitted or expenditures duplicated. The record shows that respondent was able to make the adjustments he deemed necessary working from petitioner's own books. Such bookkeeping methods are not negligent or in intentional disregard of respondent's rules and regulations. *John P. Reaver*, 42 T.C. 72, 83 (1964). We, therefore, hold that petitioner is not liable for the addition to tax for negligence provided in section 6653(a).

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

SIMPSON, *J.*, concurring: I agree with the majority in allowing the taxpayer head-of-household treatment, but I wish to express my reasons for reaching that conclusion.

In 1954, the law was changed to allow a taxpayer head-of-household treatment when he maintained his parents in a separate household. Our question is in what kind of household must the parent be maintained.

In referring to the provisions relating to head-of-household tax treatment, the committee reports frequently use the term "home" as a synonym for "household." H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 5 (1954); S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 4, 5 (1954). Thus, Congress contemplated that the taxpayer could qualify for head-of-household treatment if he provided a home for his parents. But was the term "home" intended to refer only to a house or an apart-

ment, or was it intended to also include sleeping rooms in such places as nursing homes or homes for the aged? I can perceive no reason for distinguishing between an efficiency apartment and a sleeping room. In some situations, the sleeping room might be the more suitable home for the parent—and the more burdensome for the taxpayer to provide. For these reasons I conclude that Congress intended to include rest home accommodations within the meaning of "household."

FEATHERSTON and IRWIN, *JJ.*, agree with this concurring opinion.